THE STATE, *Appellant*, v. ERB.

74 199
102 655
74 199
111 551
74 199
56a 501

1. **Insanity as a Defense to Homicide.** To entitle a defendant charged with homicide to acquittal on the plea of insanity, it must appear, to the reasonable satisfaction to the jury, that his mental faculties were, at the time the act was committed, so perverted and deranged as to render him incapable of distinguishing between right and wrong in respect to that particular act.

2. **Murder in the Second Degree.** There can oe no murder in the second degree without premeditation.

3. **Insanity:** OPINION OF NON-EXPERT. A witness who is not an expert will be allowed to give an opinion upon a question of insanity, only in connection with a statement of the facts which form the basis of his judgment.

4. **Certain** remarks of the prosecuting attorney in his closing address to the jury; *Held*, not objectionable.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*D. H. McIntyre*, Attorney General, for the State.

*Allen & Coste* for respondent.

NORTON, J.—The defendant, William Henry Erb, was

indicted in the St. Louis criminal court on the 2nd of July, 1879, for murder in the first degree for the homicide of his divorced wife, Rose Mion, *alias* Aglae Rosalie Erb, on the 19th day of June, 1879. He was arraigned at the same term and pleaded guilty, which the court refused to accept, and ordered the plea of "not guilty" to be entered. After several continuances, the cause came on for trial at the March term, 1880, and defendant was convicted of murder in the first degree, as charged in the indictment. After an unsuccessful motion for a new trial, he made an application for an appeal to the St. Louis court of appeals, which was granted. That court reversed the judgment of the criminal court, whereupon the circuit attorney for the State appealed the case to this court.

The principal objections made by defendant's counsel, in their motion for a new trial, are to the action of the court giving certain instructions on its own motion, and refusing others asked by defendant; in admitting improper and illegal testimony for the State, and excluding competent and legal testimony for the defendant, and the action of the court in refusing to instruct the jury to disregard certain alleged improper statements made by the circuit attorney in his address to the jury.

The facts disclosed by the evidence on the part of the State to establish the *corpus delicti* are that the defendant, having heard that the deceased, who had been divorced from him for some years, was about to marry again, went to his home, procured a knife and proceeded to the house of deceased, where she was engaged in washing, and asked her "if that was true," to which deceased made no response, whereupon defendant stabbed her twice in the back, the knife penetrating the left ventricle of the heart, and inflicting a wound of which she immediately died; that defendant, after committing the homicide, threw the knife, with which he inflicted the wound, into the vault of a watercloset, and walked away up Spruce street, and upon being arrested said he did not cut any woman; that about three

hours after his arrest, upon being asked why he killed his wife, he answered : " Who said I killed her?" and upon being told "your little daughter said so," replied that: " She can't say so; I have not seen my wife for over a year. I never had such a knife." On the morning after the homicide defendant said there was no use in denying the killing; that his wife had not treated him well; had once put him in the workhouse; that he had been told, the afternoon of the homicide, that she was going to marry somebody, and he made up his mind, while sitting on the stone, to get his knife; that he then went home and got it; that he then went to his wife's house and entered the front door and met his little girl and asked her where her mother was, and, upon being told that she was in the yard, he went into the yard and saw his wife at a wash-tub, and asked her if that was true, meaning if she intended to marry, and upon receiving no reply, defendant said he " then gave it to her" and " threw it away," meaning the knife, and then went up Spruce street to Fourth street. These facts sufficiently characterize the brutal nature of the act, and viewing the homicide in the light of them alone, they unquestionably establish the crime of murder in the first degree.

The only defense relied upon at the trial was that of insanity. This defense was sought to be established by showing that defendant had been addicted to strong drink for a number of years; that previous to 1865 he lived in Paducah, Kentucky, and while there had drunk to such excess as to produce on several occasions delirium tremens ; that he had attempted, while in Kentucky, on one occasion, to jump out of a two-story window, on another occasion to poison himself, and on another attempted to kill a man with a knife, which he was trying to take from him ; that when sober he was peaceable and quiet; when drunk, dangerous and quarrelsome ; that he removed to St. Louis in 1865, where he continued his habit of drinking. As to the extent to which he indulged in this habit after his re-

moval to St. Louis the evidence is conflicting, some of the witnesses stating that he indulged in it in 1876 to such an extent that he became very much depraved and on the verge of delirium tremens, on which occasion he cut his wrist and said he was going to kill himself; that in 1878 he was prostrated from the heat; that about that time and afterwards he would not rest well of a night, would often be restless and complain of headache and burning sensation in his stomach, and request not to be left alone at night. All the witnesses concur in saying that during his residence in St. Louis he was never unwell except as above stated, and never unable to attend to business, though during the time he was often drunk. As to the condition of defendant at the time the homicide was committed, all the witnesses who saw him immediately after the occurrence concur in saying that he was not drunk, but appeared to be sober, his own admission being that he had drunk twice on the day of the homicide. Upon the close of the evidence, defendant's counsel put a hypothetical case to a physician who was an admitted expert on the question of insanity, to which the physician answered "that he would call it simply a case of alcoholism; that he could not define it as a case of insanity; that the case put was one where the responsibility of the individual is modified by the condition of his mind. This modified responsibility is all I could predicate of this case. It would come under the head of nervous cases where an individual, though sane, would be less responsible than many who are insane." The State also put a hypothetical case to another physician, also an expert, embodying substantially the same facts, who answered "that he saw no insanity in the case."

The defendant asked nine instructions, of which the court gave numbers one and seven, and refused the others, and in 1. INSANITY AS A DEFENSE TO HOMICIDE. so doing it is insisted by counsel that the court committed error. Instruction number two, which was refused, asked the court to direct the jury in substance that if they believed defendant, at the time

of committing the homicide, was incapable of distinguishing right from wrong, or of exercising control or will power over his actions, or was unconscious at times of the nature of the crime he was about to commit, they would find defendant not guilty. In an instruction given by the court, of its own motion, the jury were told that if, at the time the stabbing occurred, defendant was so insane that he could not and did not know or comprehend the nature or character of the act, although he may have committed it, he is not guilty; that to entitle defendant to an acquittal on the plea of insanity, his mental faculties must have been, at the time the homicide was committed, so perverted and deranged as to render him incapable of distinguishing between right and wrong, and of knowing the right from the wrong of that particular act. The instruction given by the trial judge is in strict conformity to the ruling of this court in the cases of the *State v. Baldwin,* 12 Mo. 223; *State v. Hurting,* 21 Mo. 464, and *State v. Redemeier,* 71 Mo. 175. This instruction covered the ground as to insanity, and no error was committed in refusing instruction number two. Besides this, I cannot see anything in the facts of this case, transpiring at the time the act was committed, upon which to predicate an instruction telling the jury that if they believed defendant was unable to exercise control or will power over his actions when he committed the act, they would acquit.

Instructions numbers three and six were properly overruled, for the same reasons which apply to the second instruction. In all cases where insanity is interposed as a defense, whether such insanity be denominated alcoholism in its chronic form or in its acute form of delirium tremens or dypsomania, affective or emotional, ideational, or whether it be designated by any other of the various technical terms denoting peculiar forms of insanity, the question, according to the uniform course of decisions in this State, is, whether such insanity rendered the person laboring under it incapable of distinguishing between right

and wrong in respect to the act he was about to commit.

The fourth and fifth of defendant's instructions were properly refused, as they asked the court to tell the jury that if they had a reasonable doubt as to the insanity of the accused, they would acquit. Instructions containing the above principle have been repeatedly condemned by this court. *State v. Redemeier*, and cases there cited.

The eighth instruction is as follows: "The court in-structs the jury that if they believe at the time of the 2. MURDER IN THE killing charged in the indictment the mental SECOND DEGREE. and moral faculties of the defendant were so perverted from their normal condition by the habitual use of alcoholic liquors as to prevent him from understanding the nature and consequences of the act he was about to commit, and such perverted and diseased condition of his mental and moral faculties was inconsistent with delibera-tion and premeditation, as charged in the indictment, so that he could not have acted with deliberation and pre-meditation, the jury must find the defendant guilty of mur-der in the second degree, and assess the punishment at a term in the penitentiary for not less than ten years. But such diseased condition of the mental and moral faculties must be the result of an habitual use of liquor and not merely the disturbance incident to a fit of intoxication." The facts in this case, if defendant was not insane, show it to be murder in the first degree, and nothing else, and the instruction might well have been refused on that ground; but it was fatally defective on another ground, in this : that it authorized the jury to find defendant guilty of murder in the second degree without finding that the act was done with premeditation. *State v. Curtis*, 70 Mo. 594.

The ninth instruction refused, asked the court to in-struct the jury to disregard the evidence of Sergt. Frank 3. INSANITY : opin- Watkins. This witness was called in rebut-ion of non-expert. tal and was asked the question "What was defendant s appearance and conduct as to sanity or insan-ity ?" This question was objected to on the ground that

Watkins was not an expert and could not, therefore, give an opinion. This objection was properly overruled under the authority of *State v. Klinger*, 46 Mo. 229, where it was held that "Witnesses who are not experts may be permitted to state whether they deem the prisoner to be insane, but it can only be done in connection with their statements of the particular conduct and expressions which form the basis of the judgment."

It is also urged, as a reason for reversing the judgment of the trial court, that after the argument of the case before the jury had been closed, the court was asked to instruct the jury to disregard the following language used by the prosecuting attorney in his closing speech. The circuit attorney, in his closing argument, said: "Where a man is really insane, from whatever cause, he shall be protected by the State whose representative I am. For instance, take the case of Heuman, which startled the community the other day, and which, doubtless, you have all read about. He had fits and delirium tremens, and while so suffering he killed his little infant, whom he loved, and his wife by his bedside, in his insane delusion that his little infant and his wife meant to kill him. Now that is alcoholism or insanity resulting from it, which the law recognizes wherever it exists. There is nothing of this kind in Erb, the case before you. He had no delusion or insanity of any kind, and none that any person swears to. * * That there was no murder in the second degree in the case; that the testimony proved murder in the first degree, and this was not denied, as insanity was the defense; that if this was so, the jury ought not to convict of murder in the second degree, as this would be virtually pardoning the accused, and the pardoning power belonged to the governor and not to juries; that they should do their duty, and if they thought there were any mitigating circumstances they could write to the governor." We cannot say that these utterances were not fully warranted by the facts disclosed in the evidence. It is true that the

court had given an instruction for murder in the second degree, doubtless under the belief that section 1234 of Revised Statutes directed trial courts in every case of indictment for murder in the first degree to give an instruction not only as to murder in the first degree but also to murder in the second degree. This was a misconception of the statute, this court having held in the case of the *State v. Hopper*, 71 Mo. 425, that said section is not to be understood as requiring the trial court to instruct the jury as to murder in the second degree where there is no evidence upon which to predicate it.

The remark of the prosecuting attorney " that there was no murder in the second degree; that the testimony proved murder in the first degree, and that this was not denied, as insanity was the defense," could have been understood by the jury in no other sense, than if they did not believe that defendant was insane at the time he committed the act, they were bound under the evidence and the law to find him guilty of murder in the first degree. The principle thus announced in the remarks of the prosecuting attorney was directly sanctioned by this court in the case of the *State v. Baldwin, supra*. There was no mistake of law or fact, and the case does not come within the principle announced in the case of *State v. Lee*, 66 Mo. 167.

Nor do we think the appeal made to the jury to do their duty would warrant an interference with the judgment. It amounted to nothing more than an assertion of what every juror in the box, if intelligent enough to sit on a jury, knew to be a fact, viz: that their function was not to bestow mercy, but to do justice between the State and the accused. Perceiving no error, the judgment of the St. Louis court of appeals is reversed, and that of the criminal court is affirmed, in which all the judges concur, Judge Hough concurring in the result.