STATE OF MISSOURI, Respondent, *v.* CHARLES ROSE, Appellant.

### January 2, 1884.

MURDER — INSTRUCTIONS — DELIBERATION — MITIGATING FACTS. — In a trial for murder, when the evidence tends to show that the deceased shook his finger at the defendant and used foul language to him and his companions, that an affray immediately followed in which the deceased shot one of the defendant's companions, and that the defendant stabbed the deceased from behind with a knife, the evidence as to whether the defendant attacked the deceased at all being conflicting, the court in defining murder in the second degree as murder in the first degree with the element of deliberation wanting, should not merely have defined deliberation as meaning "in a cool state of the blood, not in sudden

passion engendered by a lawful or some just provocation," but should have declared to the jury as a matter of law, that the provocation as to which there was some evidence, would mitigate the homicide, and should have left it to the jury to decide whether such provocation and passion did in fact exist.

APPEAL from the St. Louis Criminal Court, VAN WAG-ONER, J.

*Reversed and remanded.*

P. N. JONES, for the appellant.

T. B. HARVEY, for the respondent.

BAKEWELL, J., delivered the opinion of the court.

The defendant was convicted of murder in the first degree, for killing one George Ingram, in St. Louis, in April, 1881.

The deceased and the defendant were negroes. The homicide was committed in a bar-room on the east side of Seventh Street, which was a resort of prostitutes. The premises had a bar in front, with a sort of sitting-room for the women and their associates in the rear. This back room was separated from the front by a partition eight feet high with a doorway in the middle. This room had a side door opening into a narrow alley-way which communicated with a yard in which were tenement houses. The yard opened upon an alley between Sixth and Seventh, Wash and Carr Streets, known to the police as Clabber Alley. The deceased was living in concubinage with a woman named Lizzie Denney. The cause of his death was a stab in the right breast. He received on the same occasion four other wounds. One on the face, which was dangerous, but not necessarily mortal, and three in the back which were not dangerous, the knife not penetrating beyond the left shoulder blade.

On the day of the homicide, about noon, deceased was sitting reading a letter in the back room spoken of above. Three or four women were sitting in the room. Defendant

Rose, Calvin Emerson, and one Williams, came into the saloon in a boisterous manner, and walked into the back room, and began joking with the women. The woman Denney, the concubine of deceased, entered from the side door. Williams threw his arm round her neck. She said she was sick, and asked to be let alone, complaining that he choked her. Ingram, the deceased, said: "Don't choke the woman; she has been under the care of a doctor." The men who had entered together, then began to talk roughly to deceased, using a great deal of foul language. They drew their knives; but put them up again. Shortly afterwards, one advanced upon Ingram with a chair, and knives were drawn again; but not by deceased. Rose said: "Let us kill the son of a bitch anyhow." Ingram stepped into the bar-room, and got a revolver out of a drawer, and stood there. Emerson followed him, with his knife open, and sprang toward Ingram. Ingram cocked his pistol and warned Emerson off; Emerson still advanced, and Ingram fired, striking Emerson in the head, who fell at once. Ingram then ran to the back room, as if to go to his room in the yard through the side door. Rose was standing in the back room, behind the partition; and, as Ingram passed him without seeing him, Rose caught him by the right arm round the neck, and stabbed him in the left side. Ingram freed himself, after a scuffle in which the stove was upset; Rose caught him again; and Ingram fired, hitting Rose in the hand. Ingram ran out by the side door and Williams cut him in the face. Rose stabbed Ingram again in the back. Ingram then ran into the bar-room, asking for protection.

This is substantially the testimony of the witnesses for the State. From their statements it would appear, that Ingram used no bad language and no threats, from first to last, except that he told Emerson when he pressed upon him, to keep back or he would fire.

One witness for defence testified, that the wound in the

heart, which was the fatal wound, was inflicted by Williams, and that Williams cut deceased twice. Another witness for the defence testified, that Rose, after the first shot, ran into the back room ; that deceased was " right behind him," pointing the pistol at him; that Rose ran around a pillar in the room, and turned right round on Ingram, and grabbed his pistol, and that Ingram then fired the second time, and Rose stepped back and upset the stove, and that Williams then cut deceased in the back and breast.

One witness for the defence testified, as follows, as to the origin of the difficulty: " Williams got hold of Lizzie Denny. She told him to let her go; she was sick. Ingram raised from his chair and told him to leave that woman be; that was his woman. Emerson spoke, says he : ' We've known this woman as long as you have, I guess.' Williams spoke up; says he : ' She is as much my woman as she is yours.' Ingram spoke, says he : ' You are a God damned liar.' Well then, it was a ' damned lie ' and a ' damned son of a bitch,' forwards and backwards, for about a minute, so fast that I could not tell who was cussing the fastest. Ingram spoke out as loud as he could, and said : ' God damn you, I'll show you whose woman she is,' and rushed by me, through the door, and ran behind the counter, and took Mr. Goldsmith's pistol."

Rose on his own behalf, testified that he never saw Ingram before the quarrel ; that he knocked the pistol aside when pointed at his heart, to save his life ; that he did not stab Ingram, and that he had no knife.

In rebuttal, the state read the testimony of defendant at a former trial, in which he stated that Ingram cursed him and his companions for " fooling " with the woman Denny ; that Rose remonstrated that he ought to address Emerson, who also had touched the woman ; that deceased then said to Goldsmith, that the black sons of bitches were putting the women about, and that he would permit no black son of a bitch to do so, and made various threats;

that Rose offered to apologize for himself and Emerson; and that Ingram came forward, shaking his finger at him; that Goldsmith advised deceased to knock them in the head with a stick of wood; that deceased then got the pistol. Emerson proposed to go home to avoid a difficulty. "I says, all right. So he started out a little before me. If he hadn't started before me, I would have got shot. He started on out. I stayed there a few minutes talking; and the first thing I knew, I heard a shot fired, and I saw George Ingram fire the bullet then. I seen the pistol shot myself; but I did not see where it went to. He come right along to shoot Emerson, and Emerson fell backwards right over that way, with a bullet hit him in the ear. When he shot Emerson, I dodged to run, because I knowed, if he shot Emerson that way, he would shoot me for the same thing, because Emerson hadn't said more than I had. So I ran against this post; and the post knocked me right back to the partition, and then Ingram came through there with the pistol drawn. I aimed to get the pistol and keep him from shooting me. I just got hold of the muzzle and he shot me through the hand. Then Williams came in from the rear way and cut Ingram twice in the back."

In this testimony, also, Rose says that he had no knife. The police officer who arrested Rose, says that he told him that he had had a knife, and cut deceased in self-defence.

There was a testimony tending to show that deceased was of a quiet disposition, and not known to swear or use rough language; and also testimony tending to show that he was of a quarrelsome disposition, and that he had quarrels before about the woman Denny.

The court instructed as to murder in the first and second degrees, and as to the law of self-defence.

In defining murder in the first degree the court defined "deliberately" to mean, "in a cool state of the blood, not in a sudden heat of passion engendered by a lawful, or some just cause of provocation;" and the court told the jury

that murder in the second degree is distinguished from murder in the first degree only by the absence of deliberation ; and that, if the jury believe from the evidence, " that, at the city of St. Louis, the defendant did, at any time prior to the finding of this indictment, feloniously, wilfully, premeditatedly, and with malice aforethought, strike, cut, stab, wound and kill George Ingram, as is charged in the indictment, and that such killing was not done deliberately, you will find him guilty of murder in the second degree."

It is not necessary to repeat what has been said as to these instructions in the opinion in the case of *The State* v. *Douglass*, delivered with this opinion. The supreme court has very recently said (*The State* v. *Ellis*, 74 Mo. 206): " What words of reproach and attendant circumstances will be deemed a just cause of provocation, and constitute the homicide murder in the second degree, is, in every case, a question of law for the court; and whether the state of mind necessary to make the killing the lowest grade of murder, was, in fact, superinduced by such provocation, and actually existed at the time of the killing, is a question of fact for the jury. And the cases must be decided as they arise, each upon its own facts. Nor do we see the propriety of instructing a jury in every case of murder as to what constitutes that technical heat of passion, or other sudden passion, which will mitigate a homicide when the facts in evidence do not tend to show the existence of any such passion. It is for the court to determine what grade or grades of homicide the evidence tends to establish; and it is the duty of the court to confine its instructions to such grade or grades. Where there is no evidence of such sudden passion, a jury may be instructed as follows: " Deliberately, means done in a cool state of the blood, not in sudden passion engendered by a lawful, or some just, cause of provocation ; and the court instructs you that, in this case, there is no evidence tending to show the existence of any such passion or provocation." When there is evidence

of such passion and provocation, it will be the duty of the court to declare, as a matter of law, whether the provocation sought to be established is such as will mitigate the homicide, and, if so, to leave to the jury the question whether such provocation and passion did in fact exist.'' And, elsewhere in that opinion, it is said, that *furor brevis* which, though it does not shut out knowledge or destroy the will, renders a man deaf to the voice of the reason, and to which the common law so far condescends that, if it is produced by a blow, the homicide committed under its influence is reduced to manslaughter, will, if produced by grievous and degrading words of reproach, naturally and justly calculated to produce this passion or excitement, reduce the instant killing in such a state of mind to murder in the second degree in Missouri, because, though there may be premeditation, there is, in such a case, no deliberation.

In the present case there was some evidence of degrading' language addressed by deceased to defendant and his companions, and of attendant circumstances well calculated to produce that sudden rage which is held not to be consistent with deliberation. The weight of the evidence as to this was for the jury. But it was not for the court to shut its eye to this evidence, however clearly contradicted; and the court should have told the jury that the provocation and passion, if established by the evidence, did, as a matter of law, reduce what would otherwise have been murder in the first degree to murder in the second degree. It was error, in view of the evidence, to leave it to the jury to determine what was and what was not '' just provocation.''

In *The State* v. *Andrew* ( 76 Mo. 101 ), it is held that evidence of recent threats by deceased against defendant — that his pistol was found under his body after he was killed, — the effort of the principal witness for the state to conceal this pistol, — in connection with the testimony of the accused, warranted an instruction for murder in the second degree. In the present case, the evidence that de-

ceased called defendant and his companions " black sons of bitches," the quarrel about the woman, the denunciations of deceased against those meddling with her, the shaking of the finger of deceased in defendant's face, and the sudden and dreadful affray, equally warranted the instruction, and made it essential to tell the jury what " just " provocation is, under our law.   It is true that if the jury believed from the evidence that deceased was attacking defendant with a loaded pistol, and that defendant stabbed in front, in necessary self-defence, it would be quite immaterial what other provocation there was; but the whole testimony and the credibility of the witnesses was for the jury alone.   They might believe any one witness as against several others, and might accept some statements of a witness and reject others equally material made by the same witness.   It was possible for the jury to find from the evidence that defendant was grossly insulted by the deceased at the time of the homicide; that these insults and an attack upon the companions of defendant by the deceased, stirred up defendant to momentary fury, and that, under this impulse, as deceased passed him, and whilst deceased was endeavoring to leave the room, and was meditating no attack upon the defendant, defendant inflicted upon deceased the fatal stab from which he afterwards died.   Because of this possible interpretation of facts in evidence, we think that the judgment should be reversed and the cause remanded for failure to give fuller instructions as to murder in the second degree.

Our attention is not directed to any other error in the record, nor have we discovered anything else upon which we think it expedient to comment.

The judgment is reversed and the cause remanded.   All the judges concur.