## WILLIAMS V. STATE.

1. INSANITY: *As an excuse for crime: Burden of proof.*

A defendant who relies upon insanity to excuse a homicide, must establish it by a preponderance of evidence; and it must appear that at the time of the killing, he was so affected by insanity as to render him incapable of distinguishing between right and wrong, in respect to the act of killing; or if he was conscious of the act he was committing, and knew its consequences, that he was in consequence of his insanity wrought up to a frenzy which rendered him unable to control his actions.

2. SAME: *Same: To be distinguished from mere passion.*

A person of sound mind who commits a criminal act, cannot avoid responsibility for it on the ground that it was done under the impulse of such passion as temporarily dethroned his reason, or for the time controlled his will.

3. SAME: *Same: Testimony of experts: Instructions.*

On a trial for murder where insanity was relied upon to excuse the act of killing and the testimony of medical experts as to the prisoner's sanity was given to the jury, he requested the court to charge that if the jury believed the testimony on which such experts based their opinions, was true; that they were learned in their profession and that their testimony was truthful and "all on one side," that the verdict should be in accordance with it. *Held:* That the testimony of experts is to be received like other testimony and the jury are not bound to accept their conclusions. The instruction was, therefore, properly refused.

Williams v. State.

4. MURDER: *Sufficiency of evidence.*

On the trial of an indictment for murder in the first degree, it was shown that the act of killing was done deliberately. The only defense was insanity, and the jury convicted the prisoner of murder in the second degree. *Held:* That as there was ground for a difference of opinion as to the sanity of the accused under the evidence and instructions of the court, the verdict will not be disturbed by this court for the want of testimony to support it.

[See the opinion for a statement of the evidence and instructions.— REP.]

APPEAL from *Hot Spring* Circuit Court.

J. B. WOOD, Judge.

*G. W. Murphy* and *A. Carl,* for appellant.

Dr Williams' opinion as to the position of the deceased, etc., was material, as it tended to show that defendant fired the shot, and was not proper matter for opinion evidence, and its admission was error. *Abbott's Tr. Ev., p.* 571; 18 *Tex.,* 498–500; 24 *Cent. L. J.,* 105; 7 *S. W. Rep.,* 1.

The instructions for the state are abstract and misleading. There was no evidence that the killing was done from motives of revenge or under an impulse of passion. Insanity is a lawful defense, and like all others is to be tested by the evidence. No case of insanity was ever more clearly proved, and yet the court refused to say to the jury, that if they believed that evidence to be true they ought to render a verdict in accordance with it. The expert evidence was uncontradicted, and must control. *Abb. Tr. Ev., p.* 494; 3 *S. W. Rep.,* 539.

Review the evidence and instructions, contending that the court erred in giving and refusing instructions, and that the verdict is contrary to the evidence. Cite *York's Case, Foster, p.* 70; *Roscoe Cr. Ev., p.* 942; 1 *Hale, P. C.* 26; 31 *Ind.,* 485; 7 *Metc.,* 500; 25 *Iowa,* 67; 27 *St. Tr.,* 1281; *Ordronaux on Insanity,* 421; *Med. Jur. of Geer., sec.* 24; *Griesenger Ment. Path. Eden., sec.* 72, *p.* 118.

Lord Erskine's *delusion* theory is a delusion and a snare,

and the right and wrong test is doubtful. See authorities sup. *Queen v. McNorton, Am. Reg.*, 140 *part* 2, *p.* 262; *Ordronaux on Insanity, p.* 422; 47 *N. H.*, 150; 49 *Id.*, 399; *Buswell on Insanity, secs.* 421–466; 1 *C. & K.*, 130.

An attempt at suicide does not alone raise a presumption of insanity, but it is a circumstance tending to prove it. 100 *Pa. St.*, 573; *Buswell on Ins., sec.* 226 *and notes.* The act itself, with its attending circumstances, is evidence of insanity. *Ib., sec.* 225.

*Dan, W. Jones, Attorney-General,* for the state.

The court did not err in the admission of the testimony of Dr. Williams as to his opinion of the relative positions of the plaintiff in error and the deceased at the time of the shooting; or, if it did err, it was not such error as to entitle the plaintiff in error to a new trial, such testimony being irrelevant and not such as to influence the verdict. *Weaver vs. Caldwell's exr., 9 Ark.,* 339; *Page vs. Parke., 40 N. H.,* 47.

The instructions of the court were in accordance with the law of this state. *McKenzie vs. State, 26 Ark.,* 334; *Casat vs. State, 40 Ib.,* 511; *Caveness vs. State, 43 Ib.,* 331; *Coats vs. State, Ante,* 330.

The jury were justified in disregarding the testimony of the medical experts, if they believed, as they must have done, that such testimony was inconsistent with the facts proved. Such testimony was, at best, merely the opinion of experts and, in the language of Lord Campbell, in *The Tracey Peerage,* 10 *Cl. & Fin., star page* 191. "hardly any weight is to be given to the evidence of what are called scientific witnesses; they come with a bias on their minds to support the cause in which they are embarked."

The jury were the judges of the weight to be given to the testimony of all the witnesses, and their verdict being supported by the evidence, it should not be disturbed.  *Ark. Rep., passim.*

BATTLE, J.  Williams was indicted for murder in the first degree, committed by the killing of Beatrice Randolph. He was tried and convicted of murder in the second degree.

In the trial of the accused, witnesses testified, substantially, as follows:   For two and a half years he was in the employ of John J. Sumpter as clerk in the Sumpter House, a hotel in the city of Hot Springs, in this state.  During this time a man named Norris and the deceased, Beatrice Randolph, went to the Sumpter House, registered as husband and wife, took a room, and remained there for some time. While there deceased and Williams became criminally intimate.  He became fond of her, and told at least two of his friends that they were intimate, and seemed proud of it; told one Spring that she had given him six hundred dollars, telling him he might retain four hundred of it, and return to her two hundred, and had proposed to elope with him to Mexico, and to furnish all the money they would need. About six weeks before her death, he told Sumpter, his employer, that she had made a deposit with him of six hundred dollars as her money, and Sumpter directed him to put it in the hotel safe.   On the morning of the 13th of March, 1886, Norris made complaint to the police, charging Williams and the deceased with having stolen six hundred dollars of his money, and had Williams arrested and taken to police headquarters.  Sumpter was aroused about three o'clock that morning, and went to the hotel office, and found him under arrest.   He went on a bond for his appearance to answer the charge, took him into a room, asked him where the money was, and he answered he had it, but wished to give it to the

woman. At Sumpter's request, he took the money, either from his pocket or shoe, and gave it to him, Sumpter promising to give it to the deceased, which he afterwards did in the presence of Norris. Sumpter retired and arose again about six o'clock in the morning, and found accused still up, and apparently nervous and excited. He upbraided him about the disgrace he had brought upon himself and family, and continued to do so in his subsequent meetings with him. Williams seemed greatly mortified, and had about him a peculiar facial expression. One witness suspected that he had been drinking, although he had not seen him drink. He had a wild, vacant, unnatural look, and appeared to be in great trouble. Deceased sent for him several times during that forenoon, the last time about half past eleven, shortly after which he was seen going in the direction of her room. Between that time and twelve o'clock, two reports of a pistol were heard in the room of the deceased, and the chief of police, with policemen, ran to the room whence the report emanated, broke open the door, which was thumb-latched or bolted, and found the deceased, Beatrice Randolph, lying diagonally across the bed speechless, dying of a gun-shot wound in her body, over the heart, and Williams sitting in a chair at the side of the bed apparently unconscious and bleeding from a gun-shot wound in the head. The chief of police spoke to him, but did not arouse him. He afterwards made some observation or gave some order about a pistol, when Williams suddenly aroused and sprang to a pistol lying on the floor, seized it, and pointed it at his head in an attempt to shoot himself, and was prevented by the interference of three policemen. He made a desperate effort to kill himself, and in his struggle with the policemen manifested unnatural strength. He did not appear to realize his situation. When he was overcome the two following papers in his hand-writing were found in his possession :

First.—"Please send this telegram to Col. S. W. Williams, Little Rock, Ark.: Your nephew, George Williams, killed himself this A. M."

Second.—"When you see the result of my rash act, you will naturally inquire, why did he do it? It is enough to know that since I have lost the respect of all, I have lost all, and hence I end my life with that of the one I love."

· For three or four days after the killing he seemed dazed and did not appear to realize his situation. One witness said he was delirious from the wound he had inflicted upon himself. After the killing, the accused said he had taken a drink on the morning of the tragedy.

Evidence was also adduced conducing to prove that Williams, prior to his intimacy with the deceased, was peaceable, quiet, moral, religiously inclined, of an affectionate nature, and could not tolerate lewd women; that he was nervous and hasty, and sometimes would act strangely and do things without seeming to think about them; that he "was full of nervous peculiarities," and was wanting in stability; that he was possessed of personal pride amounting to extreme vanity; had an inordinate regard for the opinion of others; and seemed to have a high sense of his personal honor and accomplishments.

One witness testified that when he was about four years old, he received a severe cut on the head from an axe, which was followed by fever of a typhoid, inflammatory nature, that attacked his brain. Medical experts, upon an examination of his head, testified that, in their opinion, this cut depressed the inner table of the skull, and that, if it did, it would render him subject, upon the occurrence of an exciting cause, to an attack of insanity.

Many medical experts were introduced, who testified that assuming that the testimony of witness as stated was true, it was their opinion that Williams was insane, at the time of

Williams v. State.

the killing, incapable of reasoning correctly, and so completely deprived of the control of his mental functions as to be incapable of knowing that what he was doing was wrong.

At the instance of the state the court instructed the jury as follows:

1. "The court instructs the jury that one, who, in possession of a sound mind, commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone his reason, or for the time being control his will, cannot be shielded from the consequences of the act by the plea of insanity.

2. "That insanity will only excuse the commission of a criminal act, when it is made to appear affirmatively by evidence fairly preponderating, that the person committing it was insane.

3. "The court instructs the jury that the law presumes every man to be sane until the contrary is shown; and when insanity is set up as a defense by a person accused of crime, in order that the defense may avail, the jury ought to believe from the evidence that, at the time of the commission of the alleged crime, the mind of the accused was so far affected with insanity as to render him incapable of distinguishing between right and wrong in respect to the act with which he is charged; or, if he was conscious of the act he was doing and knew its consequences, that he was in consequence of his insanity wrought up to a frenzy which rendered him unable to control his actions or direct his movements.

4. "When insanity is set up as a defense for crime the testimony must, by evidence fairly preponderating, prove that, at the time of the act, the defendant was laboring under such a defect of reason from disease of the mind, as not to

know the nature of the act he was doing, or if he did know it, that he was ignorant he was doing wrong.

5. "The killing being proved it devolved upon the accused to prove, by testimony fairly preponderating, that he was in such a condition, at the precise time the deed was done, as not to know the consequence of his act, and not to know right from wrong, unless the testimony on the part of the state shows that he was in such condition."

1. INSANITY: As an excuse for crime.

It is urged that these instructions are erroneous. In them the jury are plainly told that insanity will excuse homicide; and that in order for it to excuse the accused in this case, it must appear he was so affected by it as to be unable to distinguish between right and wrong in respect to the act with which he was charged, or if he was conscious of the act he was doing and knew its consequences, that he was, in consequence of his insanity, wrought up to a frenzy, which rendered him unable to control his actions or direct his movements. If the accused was insane, these instructions cover every legal view of his acts which can reasonably be taken. If he was insane he must have been incapable of distinguishing between right and wrong in respect to the act with which he was charged; or, in consequence of insanity, rendered unable to control his actions by the great excitement or distress which preyed on his mind at the time the act charged was done. Whatever other views may be taken of insanity, they have no application to the facts in this case.

2. SAME: Same: To be distinguished from mere passion.

In order to distinguish insanity from passion it was proper for the court to tell the jury, "that one who, in possession of a sound mind, commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of the act." One may be so far overcome by passion, as to yield himself up to its influence, and not know what he does. But such passion is not insanity.

The man infuriated by his passion is still responsible for his acts, but the insane man is not.

The fourth and fifth instructions relate to the degree of evidence necessary to prove insanity so as to entitle the accused to an acquittal, if he was so affected thereby as to have been incapable of distinguishing right from wrong in respect to the act with which he was charged, at the time it was done. It is apparent that these instructions were not intended to cover the other symptom of insanity mentioned in the instructions. The court, however, gave another instruction in which it told the jury, "that defendant is presumed to be sane and this presumption continues until overcome by proof in the case fairly preponderating." These instructions state the rule laid down by this court in *Casat v. State*, 40 *Ark.*, 511, and subsequently followed in *Coates v. State, ante*, 330.

The court refused to instruct the jury, at the instance of the accused, as follows:

5. "In the matter of insanity set up in this case, it is your duty, if you believe the testimony upon which the opinions testified by the medical experts are based is true, to weigh and test those opinions by the rule above given; and if you find that they are learned in their professions and have, in giving their opinions, testified candidly, sincerely, honestly and truthfully, you should give their testimony due weight; and, if such testimony is all on one side, you should return your verdict in accordance with it."

7. "If the jury believe the testimony of physicians and others who testified as to the mental condition of the defendant at the time of the commission of the act complained of to be true, and such testimony is all on one side, then the verdict should be in accordance with such testimony.

8. "If you believe that the medical experts, the physicians who have testified in this case, have testified to the truth, and

also believe that the testimony of the witnesses, on which their opinions as testified to, are based, is true, you should acquit the defendant."

**3. SAME:**
*Same:*
Testimony of experts:
Instructions.

These instructions were properly refused. The testimony of experts should be received by the jury as other testimony. It is given for the purpose of enlightening, and not for the purpose of controlling their judgments. They are not bound to accept the conclusions of experts instead of their own. Upon them rests the responsibility of returning a correct verdict. If the opinions of experts are opposed to their convictions they may reject them. "There is no rule of law," it is said, "that requires jurors to surrender their judgments implicitly to, or even to give a controlling influence to; the opinions of scientific witnesses, however learned or accomplished they may be, and however they may speak with conceded intelligence and authority, aided by the accumulated result of a long experience." *Rogers on Expert Testimony, secs.* 37–42, *and cases cited;* 1 *Wharton & Stille's Medical Jurisprudence, secs.* 194–198.

There was another instruction which the accused asked and the court refused, which we think was sufficiently covered by the instructions given. Construing the instructions given as a whole we think there is no error in them prejudicial to the plaintiff in error.

Dr. A. N. Williams, who testified in the trial, was asked by the prosecuting attorney, after stating the position in which the accused and the deceased were found, and the nature of the wound and its position, to give his opinion as to what her position was when she received the wound, if the accused, at the time of firing the shot, was sitting on the same chair that he occupied when he, witness, entered the room. The accused objected to the question, but the court allowed it to be answered. He now insists this was error. Admit it, and it does not apper he was prejudiced by it. The

Williams v. State.

object of the question was to ascertain the opinion of the witness as to the position of the deceased at the time the fatal shot was fired. We cannot see how this prejudiced the accused.

But plaintiff in error insists that the verdict of the jury was contrary to the evidence and the instructions of the court. That he took the life of the deceased there is no room for doubt. Was he insane, and did he know he was doing wrong, when he did so? There was evidence conducing to prove that he fastened the door when he entered the room of the deceased. His own explanation of his conduct, found upon his person, in his own handwriting, shows his consciousness of the wrong he was about to do. "When you see," says he, "the result of my *rash* act, you will naturally inquire why did he do it?" His conduct and mental condition after the killing may be fairly attributed to the wound he had inflicted upon himself. His effort to take his own life does not necesssarily prove or raise the presumption that he was insane. He had been moral and religiously inclined. He was possessed of personal pride amounting to extreme vanity, and seemed to have had a high sense of personal honor. When he was exposed and arrested he believed he was disgraced, and had lost all, and preferred death to life, and attempted suicide. He says, in his own explanation, "it is enough to know that since I have lost the respect of all, I have lost all, and hence I end my life with that of the one I love."

Griesenger, in his work on Mental Pathology, says: "When a man of very delicate feeling puts an end to his existence, that he may not survive the loss of his honor, or of some other highly valued possession which forms an intimate part of his intellectual being—when a man prefers death to a miserable, contemptible life, full of mental and physical ills—morality, indeed, may call him to account for

*Margin note: 4. MURDER: Sufficiency of evidence.*

the deed, but there exists no grounds on which we can consider him insane; the abhorrence of life and the idea of self annihilation correspond to the intensity of the painful impressions which bear upon this individual, and it is after deliberate reflection that the act is resolved upon and perpetrated." 1 *Wharton & Stilles Medical Jurisprudence, sec.* 637; *Buswell on Insanity, sec.* 226; *Regina v. Burton,* 3 *Cox Cr. Cas.,* 275; *McAdam v. Walker,* 1 *Dow,* 148; *Duffield v. Morris,* 2 *Harr.,* 375; *Terry v. Ins. Co.,* 1 *Dillon, C, C.,* 403; *Merritt v. The Cotton States Life Ins. Co.,* 55 *Ga.,* 103.

Why he took the life of the deceased is difficult to comprehend. It was deliberately done. It is difficult to conceive how any reasonable being can deliberately commit any heinous crime, yet such crimes are deliberately committed by sane men. In this case the accused felt the sense of his shame so keenly as to seek relief in death. The deceased was the cause of his ruin. She had seduced him from the paths of virtue and led him to his downfall. He was sensible of that fact. When aroused to a consciousness of his shame no one can tell the change his feelings towards her underwent. They were such as to cause him to attempt the destruction of his own life. Why should they have led him to pursue a different course towards the deceased? The fact of killing, unexplained, does not raise the presumption that it was the result of insanity. The burden of proving insanity was upon the accused. The jury were the judges of the weight of evidence and credibility of witnesses. There is room for a difference of opinion as to the sanity of the accused under the evidence and the instructions of the court. We are not, therefore, authorized to reverse the judgment of the court below, because the verdict of the jury is not in accord with an opinion we may entertain.

There were exceptions to evidence and to remarks made by the court to counsel while in the midst of his argument,

which we have not overlooked, and do not consider necessary to mention here.

Finding no error in the proceedings of the court below prejudicial to the plaintiff in error, its judgment is affirmed.