THURMAN *v.* STATE.

Opinion delivered January 30, 1928.

1. CRIMINAL LAW—CROSS-EXAMINATION OF EXPERT.—In a murder trial, wherein the defendant proved a wound in the head and subsequent suffering from headaches in an effort to show irresponsibility for his acts, it was not error to permit the prosecuting attorney to ask, on cross-examination of a physician introduced on the issue of insanity, as to whether such headaches

were the result of the wound, or of dissipation or drunkenness, the purpose of the cross-examination being to test the physician's knowledge of the cause of headaches, rather than to assail defendant's character, which had not been put in issue.

2. CRIMINAL LAW—FORM OF HYPOTHETICAL QUESTIONS.—In a murder trial, failure of the prosecuting attorney in hypothetical questions to include all of the undisputed facts as a basis of hypothetical questions was cured by an instruction of the court to the expert witness to consider all the undisputed facts in his answer.

3. CRIMINAL LAW—HYPOTHETICAL QUESTIONS.—In a murder trial, the prosecuting attorney's hypothetical questions to defendant's expert witness, describing defendant's acts in firing the gun ten or twelve times in interim between date of purchasing it and of killing deceased as practicing shooting at a target, *held* not improper as assuming a fact not inferable from the evidence.

4. CRIMINAL LAW—EXCLUSION OF TESTIMONY—HARMLESS ERROR.—Error, if any, in excluding the answer of defendant's expert witness as to whether he believed defendant was mentally responsible for killing deceased, was cured by his subsequent testimony that one in defendant's condition could not distinguish between right and wrong as could one in normal condition, and the defendant could not so distinguish in the particular act.

5. CRIMINAL LAW—OPINIONS OF NON-EXPERT.—Opinions as to defendant's sanity by non-expert witnesses, who had known him a long time and associated and conversed with him before and after the crime, *held* admissible to rebut expert testimony as to his insanity at the time of the killing.

6. CRIMINAL LAW—OPINIONS OF NON-EXPERT WITNESSES.—In weighing the opinions of non-expert witnesses as to defendant's sanity, the jury were properly told to consider the sources of their information, and to attach such value to their opinions as the facts upon which they based same warranted.

7. CRIMINAL LAW—INSTRUCTION AS TO EXPERT TESTIMONY.—It was not error to instruct the jury that, if they believed any fact or facts stated to the medical experts in the hypothetical questions asked them were not true, they should disregard the opinions of such experts as to defendant's sanity at the time of the killing.

8. CRIMINAL LAW—REFUSAL TO DUPLICATE INSTRUCTIONS.—It is not error for the court to refuse to duplicate instructions.

9. HOMICIDE—INSTRUCTIONS—HARMLESS ERROR.—An instruction on a charge of murder in the first degree to find defendant guilty of murder in the second degree if the jury entertained reasonable doubt as to whether there were premeditation and deliberation being favorable to defendant, he cannot complain on appeal on the ground that the facts showed that he was guilty of murder in the first degree or nothing.

Appeal from Garland Circuit Court; *Earl Witt,* Judge; affirmed.

*Cobb & Cobb,* for appellant.

*II. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

Humphreys, J. Appellant was indicted in the circuit court of Garland County for murder in the first degree for shooting and killing Lafayette Branam. On the trial of the alleged crime he was convicted of murder in the second degree, and adjudged to serve a term of fifteen years in the penitentiary as a punishment therefor, from which is this appeal.

When arrested, appellant voluntarily confessed that he shot and killed Lafayette Branam on the day charged in the indictment. The confession was reduced to writing, and introduced in evidence on the trial of the cause, which is as follows:

"My name is Wayne Thurman. I am twenty-one years old, and reside at Red Oak, nine miles from Hot Springs. I will make a statement of my connection with the killing of Lafayette Branam. I left the house Monday morning about 8:30, and I was going down to Bill Farr's place. Just before I got to Bill's I saw Branam and some of his children on a wagon. He was sitting in the back, and the best I could judge he had a shotgun. I couldn't tell just what kind of a gun it was. I waited awhile after he had gone down the road, and then went on to Bill's place. I was down there about a half an hour, I judge, and then I went back home. I got my rifle, a 30-caliber rifle, and I went about three-quarters of a mile west of our place, and then I turned to the right and went on about a mile, and then I turned back to the right and went up White Oak Creek about a mile, to where Branam was at work in his field, plowing, and when I got there it was about 12 o'clock, and Branam was eating dinner, and so I waited until after he had eaten dinner and started back to work in the field, and I went up to the wire fence, about one hundred yards of where he was at work, and I waited—he had gone a

couple of rounds—and then I went on up closer, probably within fifty yards of him, and he came down to the creek to get a drink, and just as he got to the creek I raised up from where I was hiding, and kicked the wire fence and said, 'Branam, I am here to get you.' When I spoke he was standing with his right side to me, and he turned his head and facing me, and, just as he turned facing me, I started firing. I shot five times, and, after I had shot what shells I had in my gun, I turned and went down the fence for about 250 yards, crossed the creek, and then recrossed it, and went across the road right in front of the Scott house, the old Scott house, and went down the road for about—an old road—for about 150 yards, and then turned back toward home. I went straight home, and when I got there Dr. Housley and his wife were there, and they had already told the folks that Branam had been killed. I went to my room and changed clothes, and lay down across the bed and waited for the officers. I bought the gun at Hall's pawnshop, after Branam had killed my brother. After I left home, and before I got to Branam's field, I fired one shot to test the gun. I had fired the gun previous to that time ten or twelve times. I kept the gun in my room. Branam staggered at the first shot, and I think he was on the ground when I fired the last. The gun was a 30, lever action, and it threw the shells when I worked the lever. I threw all of the shells out at that place. I carried the gun back home, and carried it over in the field, and there I hid it. This confession is made voluntarily, and signed and sworn to on the day after the occurrence.''

The other evidence introduced by the State corroborated the statement made by appellant that he killed Lafayette Branam in the manner detailed in the confession.

Appellant made no attempt to contradict the evidence introduced by the State relative to the charge, but interposed the defense of insanity thereto.

The first assignment of error for a reversal of the judgment is that the court allowed the prosecuting attor-

ney, on cross-examination of Dr. T. B. Hill, introduced by appellant on the issue of his alleged insanity, to ask whether the headaches from which appellant suffered, and which he was called upon to treat, were the result of a wound appellant had received in his head some years before, or from dissipation or drunkenness. Appellant contends that the purpose of the question was to get before the jury a statement that he was given to excessive dissipation and drunkenness, in an effort to assail his character, which had not been put in issue. We cannot agree with the construction placed upon the question by appellant. Appellant had proved the injury to his head and subsequent suffering from headaches, in an effort to show irresponsibility for his acts. This question was asked to test the physician's knowledge of the cause of the headaches, whether the result of the injury, or from other causes. The witness answered that he did not know what caused the headaches, which discloses the wisdom of permitting the question. The impression had been left, after direct examination, that the headaches were the result of an injury to the head, as tending to prove irresponsibility. When the physician could not connect the headaches with the injury, it weakened the effect of his testimony. The interrogatory was legitimate on cross-examination.

The next assignment of error for a reversal of the judgment is that the court allowed the prosecuting attorney to propound a cross-interrogatory to Dr. J. P. Randolph, one of appellant's expert witnesses on the issue of insanity, which did not embrace all the undisputed facts in the testimony essential to the issue. The witness was not permitted to answer the question until instructed by the court to consider all the undisputed facts embraced in both appellant's and the prosecuting attorney's hypothetical interrogatories. This cured errors of omission in the prosecuting attorney's interrogatories. Appellant also objected to the hypothetical question of the prosecuting attorney because it assumed as a fact that, after appellant bought the rifle with which

he shot Lafayette Branam, he practiced shooting with
it at a target. The argument is made that there is no
evidence from which a legitimate inference might be
drawn to the effect that he practiced shooting the gun
at a target. Appellant did not claim to have fired the
gun ten or twelve times at random in the air or at game.
The legitimate inference is that he shot at some object,
and any object at which he shot might have been charac-
terized as a target. There was no error in thus describ-
ing the acts of appellant in firing the gun ten or twelve
times in the interim between the date of purchase and
the killing of Branam.

The next assignment of error for a reversal of the
judgment was the refusal of the court to allow appellant
to ask Dr. George M. Eckels, one of his expert witnesses
on the issue of insanity, after he had answered a hypo-
thetical question, whether he believed appellant was
mentally responsible for the act of killing Lafayette
Branam. If the question in the form asked was proper,
the error in excluding the answer was cured by the sub-
sequent testimony of the witness, to the effect that one
in appellant's condition could not distinguish between
right and wrong the same as one in a normal condition,
and that appellant could not, in his opinion, distinguish
between right and wrong in the particular act of killing
Lafayette Branam.

Appellant's next assignment of error for a reversal
of the judgment was the admission of the opinion of a
number of non-expert witnesses touching the sanity of
appellant, in rebuttal to the testimony introduced by him
tending to show that he was insane when he killed Lafay-
ette Branam. The admission of their testimony was chal-
lenged on the ground that they did not detail the facts
upon which they formed their respective opinions. We
have carefully read the evidence of each, and are of opin-
ion that each disclosed evidence growing out of their
conversations with him which warranted each in giving
an opinion. Most of them had known appellant for a

long time, and had associated with him and conversed with him both before and after the commission of the offense. Appellant also contends, in this connection, that the court erred in allowing the jury to pass upon the admissibility of the testimony of the non-expert witnesses, instead of assuming that responsibility himself. It is argued that this was the effect of instruction number 12, given by the court over appellant's objection. We do not so interpret the instruction. The purport of the instruction, as we construe it, was to tell the jury, in weighing the opinion of each to consider the sources of his information and to attach such value to his opinion as the facts upon which he based same warranted. The instruction correctly announced the law.

Appellant's next assignment of error for a reversal of the judgment was in giving instruction number 11 by the court. The part of the instruction criticised by appellant is as follows:

"But, if the jury should believe that any fact, or facts, stated to the medical experts in the questions asked them, are not true, then you should disregard whatever opinion they expressed on the question of the defendant's sanity at the time of the killing."

Appellant suggests that the court should have used the following language instead of the language used:

"If the jury finds any fact, or facts, in the hypothetical questions, material to the issue of defendant's insanity, untrue, then they would be at liberty to disregard the opinion of the experts as to the sanity of the defendant at the time of the killing."

The questions referred to by the court in that part of the instruction objected to related to hypothetical questions which had been propounded to the medical experts, material to the issue of appellant's sanity or insanity, as may readily be seen by reference to other parts of the instruction. We think the language used by the court, when interpreted in the way the court used it, meant exactly what the suggested language of appellant means. The whole instruction given by the court

conforms substantially to the rule announced by this court in the case of *Kelly* v. *State,* 146 Ark. 509, 226 S. W. 137.

Appellant's next assignment of error for a reversal of the judgment was the refusal of the court to give his requested instructions numbers 2, 3, 5 and 6, in connection with instruction No. 6, which was given by the court. We deem it unnecessary to set these instructions out at length in this opinion. Suffice it to say that we have examined them, and find that the requests of appellant numbered 2, 3, 5 and 6 were fully covered by instructions 9 and 10 given by the court. It is not error for the court to refuse to duplicate instructions, in fact the court should avoid multiplying instructions.

The next and last assignment of error for a reversal of the judgment was the giving of instruction number 16, which is as follows:

"If you believe from the evidence, beyond a reasonable doubt, that the defendant was of sound mind, and the killing was unlawful and felonious and done with malice aforethought, but entertain a reasonable doubt as to whether or not there was any premeditation and deliberation, then you should find the defendant guilty of murder in the second degree, and fix his punishment at imprisonment in the penitentiary for a period of not less than five nor more than twenty-one years. If, on the whole, you should entertain a reasonable doubt of the defendant's guilt of either of the grades of homicide included in the charge, then you should find the defendant not guilty."

It is argued that there was no place in the case for the instruction, because the facts showed that he was guilty of murder in the first degree or nothing. This court ruled, in the case of *Williams* v. *State,* 50 Ark. 511, 9 S. W. 5, a case where the undisputed proof showed a deliberate killing and where the defense was insanity, that, "as there was ground for a difference of opinion as to the insanity of the accused, under the evidence and the instructions of the court, the verdict will not be

disturbed by this court for the want of testimony to support it.''

The instruction was favorable to appellant, and he is in no position to complain.

No error appearing, the judgment is affirmed.