[No. 1296.]

THE STATE OF NEVADA, RESPONDENT, *v.* GEORGE W. LEWIS, APPELLANT.

CRIMINAL LAW—INSANITY—EVIDENCE—PRESUMPTION—BILL OF EXCEPTIONS. —Certain questions asked witnesses as to conversations had with defendant, the answers to which might, or might not, be relevant in determining the question of defendant's sanity, were excluded by the court. *Held*, that all presumptions were in favor of the court's ruling; that in order to show that the answers to the questions were material, relevant or important defendant's counsel should have stated what they expected to show, and then, if the questions were ruled out, embodied the facts in a bill of exceptions, so as to clearly present the point.

IDEM—CONVERSATIONS—WHEN ADMISSIBLE.—*Held*, that to justify a reversal of the case upon the ground of the exclusion of the questions it should affirmatively appear that the conversations had some special significance indicating either mental disease or tending in some degree to show an unsound mind or insanity upon the part of the defendant.

IDEM—ERROR WHEN CURED.—*Held*, that the error, if any, in excluding certain questions to a witness was cured by the testimony given by the witness in answer to other questions substantially to the same effect.

IDEM—OPINION OF WITNESSES, NON-EXPERTS—ADMISSIBILITY OF.—Opinion of witnesses, not experts, as to the sanity of a defendant is admissible in evidence if the witnesses have had sufficient observation to enable them to form a belief upon the question, without giving in detail the facts upon which their opinions are based

IDEM—SANITY OF DEFENDANT PRIOR TO, AND SUBSEQUENT TO, THE HOMICIDE, ADMISSIBLE.—The real question to be determined by the jury is as to the defendant's sanity or insanity, at the time of the homicide. The testimony as to the condition of his mind at times previous and subsequent thereto is admissible solely upon the ground that it tends to show the mental condition at the time of the homicide.

IDEM—COMPETENCY OF WITNESS.—A person who had known accused for four months, had seen him every day during that time, had sat at the same table and eaten with him once or twice, had observed his manner of speech and conversation, had seen him in the evening and night before the homicide, and had had considerable conversation with him on the day after, is a competent witness as to the sanity of accused.

IDEM—INSTRUCTIONS — CAPACITY OF DEFENDANT TO DISTINGUISH RIGHT FROM WRONG.—The instructions of the court to the effect that if the defendant has capacity and reason sufficient to enable him to distinguish right from wrong as to the particular act in question, and has knowledge and consciousness that the act he is doing is wrong and will deserve punishment, he is, in the eye of the law, of sound mind and memory and should be held responsible for his acts: *Held*, correct. (See instructions in opinion.)

IDEM—INSANITY—BURDEN OF PROOFS—PRESUMPTIONS.—The court instructed the jury that the defendant " is presumed to be sane until the contrary is

shown, and a doubt upon this question alone should not acquit, for insanity is an affirmative proposition, and the burden of proving it is upon the defense." *Held*, correct.

IDEM—PREPONDERANCE OF EVIDENCE.—Insanity as a defense to crime must
    be established by a preponderance of evidence.

IDEM—INSANE DELUSIONS.—The court instructed the jury that "an insane
    delusion is an incorrigible belief, not the result of reasoning, in the existence of facts which are either impossible absolutely or are impossible under the circumstances of the individual," etc. *Held*, correct.

IDEM—RESPONSIBILITY OF DEFENDANT IF FACTS WERE TRUE.—The court
    instructed the jury " that when a person labors under a partial delusion
    only, and is not in other respects insane—that, is not insane upon all subjects—he must be considered in the same situation as to responsibility as if the facts, with regard to which the delusion exists, were real." *Held*, correct.

Appeal from the District Court of the State of Nevada, Elko County.

R. R. BIGELOW, District Judge.

The facts are sufficiently stated in the opinion.

*J. W. Dorsey*, and *J. A. Plummer*, for Appellant.

I. The court erred in refusing to allow defendant's witness, Anna Bates, to testify to a certain conversation had with defendant during his confinement in the county jail. This evidence of the state of the mind both before and after the act done is admissible. (2 Green. Ev., Sec. 371; *Dickinson* v. *Barber*, 9 Mass. 225; 6 Am. Dec. 58; *Shailer* v. *Bumstead*, 99 Mass. 112; *Commonwealth* v. *Pomeroy*, 117 Mass. 143; *People* v. *March*, 6 Cal. 547; *Warren* v. *State*, 9 Tex. App. 619; 35 Am. Rep. 745; *Webb* v. *State*, 5 Tex. App. 608; *Grant* v. *Thompson*, 4 Conn. 203; 10 Am. Dec. 119; *McLean* v. *State*, 16 Ala. 672; *McAllister* v. *State*, 17 Ala. 434; 52 Am. Dec. 180; *Waterman* v. *Whitney*, 11 N. Y. 157; 62 Am. Dec. 71; *State* v. *Hays*, 22 La. Ann. 39; *Freeman* v. *People*, 4 Denio, 40; 47 Am. Dec. 216; Buswell Ins. Sec , 216; 1 Bish. Cr. Law, Sec. 476.)

II. The court erred in refusing to allow defendant's witnesses, Pete Webber and J. A. Plummer, to answer certain questions relative to defendant's mental condition.

III. The court erred in refusing to allow the defendant's witness, J. Henderson, to relate a conversation had with the defendant a day or two after his arrest, this testimony being

offered to show the mental condition of the defendant at the time of the conversation.

IV.  The court erred in allowing the witness Hume and other witnesses to answer, over defendant's objections, certain questions, and to give his opinion relative to defendant's sanity.  The facts must previously have been disclosed; the jury is first to be made acquainted with the defendant's acts, conversations and declarations; the opinion of the witness must then be restricted thereto and based thereon; a recital of the causes leading to and inducing the formation of the opinion, is a prerequisite to the admission of such testimony.  (*O'Brien* v. *People*, 36 N. Y. 276; *Matter of Ross*, 87 N. Y. 520; *Holcomb* v. *Holcomb*, 95 N. Y. 320; *People* v. *Conroy*, 97 N. Y. 67; *Hewlett* v. *Wood*, 55 N. Y. 634; *Yanke* v. *State*, 51 Wis. 470; *Sutton* v. *Regan*, 5 Blackf. 217; 33 Am. Dec. 466; *Grant* v. *Thompson*, 4 Conn. 203; 10 Am. Dec. 119; *State* v. *Stickley*, 41 Iowa, 232; *Dunham's Appeal*, 27 Conn. 193; *Morse* v. *Crawford*, 17 Vt. 499; 44 Am. Dec. 349; *Potts* v. *House*, 6 Geo. 324; 50 Am. Dec. 340; *Pelamourges* v. *Clark*, 9 Iowa, 1; *Dickinson* v. *Dickinson*, 61 Penn. St. 401; *Rambler* v. *Tryon*, 7 Serg. & R. 90; 10 Am. Dec. 444.

V.  A witness will not be allowed to give an opinion as to the capacity of a person whose sanity is at issue.  (Buswell on Insanity, Sec. 157; *Runyan* v. *Price*, 15 Ohio St. 14; 86 Am. Dec. 459; Lawson Ex. & Op. Ev., 137; *State* v. *Stickley*, 41 Iowa, 232; *Farrell* v. *Brennan*, 32 Mo. 328; *State* v. *Klinger*, 46 Mo. 224; *Fairchild* v. *Bascomb*, 35 Vt. 398; *Hunt* v. *State*, 9 Tex. App. 166; *May* v. *Bradlee*, 127 Mass. 414; *Wichita & W. R. R. Co.* v. *Kuhn*, 38 Kan. 675; *Van Zandt* v. *Mut. Ben. Ins. Co.*, 55 N. Y. 179; 14 Am. Rep. 215; *De Witt* v. *Barley*, 17 N. Y. 340; *Hewlett* v. *Wood*, 55 N. Y. 634; *O'Brien* v. *People*, 36 N. Y. 281; *Clapp* v. *Fullerton*, 34 N. Y. 194; 90 Am. Dec. 681; *State* v. *Vincent*, 24 Iowa, 570; 95 Am. Dec. 758.)

VI.  The test is not whether the defendant may be able to distinguish between right and wrong in the abstract or in relation to other and different matters, but whether the defendant knew the act charged to be wrong, and knew it at the very time of its commission.  (*Flanagan* v. *People*, 52 N. Y. 467; 11 Am. Rep. 731; *State* v. *Erb*, 74 Mo. 199; *State* v. *Danby*, 1 Houst. Cr. Cas. 167; *Roberts* v. *State*, 3 Geo. 310; *Commonwealth* v. *Rogers*, 7 Met. 501; 41 Am. Dec. 458; *McNaughten's Case*, 10 Cl. & F. 200.)

VII.  The court erred in the instructions given to the jury on its own motion, in giving instructions asked for by the prosecution,

and in refusing instructions asked for by the defense as to the burden of proof. (*Commonwealth* v. *Campbell*, 24 Pick. 373; 35 Am. Dec. 326; *Commonwealth* v. *McKie*, 1 Gray, 61; 61 Am. Dec. 410; *State* v. *Flye*, 26 Me. 312; *State* v. *Crawford*, 11 Kan. 32; *State* v. *Mahn*, 25 Kan. 186; *Guetig* v. *State*. 66 Ind. 94; 32 Am. Rep. 99; *Hopps* v. *People*, 31 Ill. 385; 83 Am. Dec. 231.) There are decisions to the contrary; but we believe that reason, analogy, a correct application of the principles of the law, and the better authorities sustain us in asserting that the burden never shifts, and also that whenever an issue of fact is joined upon the question of sanity, it becomes necessary, before a conviction can be had, that the whole proof should show the sanity of the defendant beyond a reasonable doubt. (*Stevens* v. *State*, 31 Ind. 485; 99 Am. Dec. 634; *Bradley* v. *State*, 31 Ind. 492; *Guetig* v. *State*, 66 Ind. 94; 32 Am. Rep. 99; *People* v. *McCann*, 16 N. Y. 58; 69 Am. Dec. 642; *Brotherton* v. *People*, 75 N. Y. 159; *Moett* v. *People*, 85 N. Y. 375; *O'Connell* v. *People*, 87 N. Y. 377; 41 Am. Rep. 379; *Hopps* v. *People*, 31 Ill. 385; *Cunningham* v. *State*, 56 Miss. 269; 21 Am. Rep. 360; *Anderson* v. *State*, 42 Ga. 9; *Westmoreland* v. *State*, 45 Ga. 225; *State* v. *Crawford*, 11 Kan. 32; *State* v. *Mahn*, 25 Kan. 182; *Smith* v. *State*, 4 Neb. 277; *Wright* v. *People*, 4 Neb. 407; *State* v. *Bartlett*, 43 N. H. 224; 80 Am. Dec. 154; *State* v. *Pike*, 49 N. H. 399; 6 Am. Rep. 533; *People* v. *Garbutt*, 17 Mich. 10; 97 Am. Dec. 162; *State* v. *Jones*, 50 N. H. 369; 9 Am. Rep. 242.) Even in those courts where the knowledge test is still applied, the later and better decisions hold that the accused must also have sufficient mental power to apply that knowledge to the act, and must be able to control himself in relation thereto. (*Commonwealth* v. *Rogers*, 7 Met. 500; 41 Am. Dec. 458; *Wright* v. *People*, 4 Neb. 407; *Commonwealth* v. *Mosler*, 4 Penn. St. 264; 1 Whart. Cr. Law (9 ed.), Sec. 33; 1 Bish. Cr. Law (2 ed.), Sec. 294; Whart. & Stille Med. Jur., Secs. 146–152.)

*J. F. Alexander, Attorney General*, for Respondent.

I. The court did not err in excluding the questions asked of the several witnesses. To treat crime with levity is no proof of insanity. (*People* v. *Francis*, 38 Cal. 191.)

II. The witness Hume was qualified by his acquaintance with appellant to give an opinion as to his sanity or insanity. (*Florey's Ex.* v. *Florey*, 24 Ala. 241.)

III. The burden of proof, where the defense is insanity, is upon the defendant.

IV. The test of insanity is the power or capacity of the pris-

oner to distinguish between right and wrong at the time of the particular offense. (*People* v. *Hobson*, 17 Cal. 424; *People* v. *Coffman*, 24 Cal. 230; *People* v. *McDonell*, 47 Cal. 134; *People* v. *Beam*, 66 Cal. 394.

By the Court, HAWLEY, C. J.:

Appellant was convicted of murder in the second degree for the killing of George Piccoli, and was sentenced to the penitentiary for the term of his natural life. Upon the trial he relied upon two separate and distinct defenses: (1) Self-defense; (2) Insanity. The various questions presented for our determination relate solely to the plea of insanity. In order to thoroughly understand the nature of the objections urged by counsel, and to fully comprehend the rulings of the court thereon, it will be necessary to give a brief statement of the facts concerning the homicide and a synopsis of the testimony bearing upon the question of appellant's insanity, as the rulings of the court must, to a great extent, be determined with reference to the particular facts and circumstances that were introduced at the trial.

Appellant was the foreman of the Tripoli mine at Bullion, in Elko county, and had been employed in that capacity for about four months prior to the homicide. Piccoli, the deceased, was a laborer in the same mine. The men boarded and lodged at Highland, about two miles distant from Bullion. About two weeks prior to the homicide, Piccoli quit working in the mine on account of the bad air therein. After he quit work, appellant sent him word that he need not return. On the evening of September 2, 1887, there was a dance in Highland, which was very generally attended. After the dancing was over, several young men, including appellant and deceased, went into a saloon near by, and treated each other. Piccoli was very drunk. Appellant was sober. Piccoli was sitting on the top of the counter, with his feet hanging down. Appellant was standing at the end of the counter. Piccoli said in a loud voice. "People in this place don't like me because I am an Italian." Several persons present said, (among the number was appellant:) "You are mistaken." Piccoli, then directing his remarks to appellant, said: "I can work in a mine with

you anywhere." Appellant replied: "You have no money that
says so." Piccoli said he had, placing his hand on his hip
pocket. Appellant then said: "You are a liar if you think so."
Piccoli replied: "You are a bastard," or words to that
effect. Appellant stepped back and picked up a chair,
raised it, and was in the act of striking, when others
interfered, and appellant was removed from the saloon.
This difficulty occurred between the hours of two and three
o'clock on the morning of the third of September. Appel-
lant after his removal from the saloon, went to different
places in Highland for the purpose of getting a pistol. Fail-
ing to obtain one he started alone and walked to Bullion.
There, without the knowledge of any other person, he secured
a pistol, and in company with Fred. Loschenkohl returned to
Highland. On the way he repeated to Loschenkohl what he
claimed to be the facts of the difficulty in the saloon, differing
to some extent from the testimony of other witnesses as given
at the trial. He stated that Piccoli called him into the saloon
to take a drink, but he thought it was for a row; that he called
Piccoli a s—— of a b———, instead of a liar, (appellant in his tes-
timony denies this part of the statement,) and gave a different
version of some of the other minor and unimportant details.
After mentioning to his companion the efforts he had made to
get a pistol in Highlands, he said: "I am prepared for him
now." He further stated that "he was going to kill Piccoli;"
that "a man that called him a bastard could not live."
Loschenkohl remonstrated with him, tried to persuade him to
stop, and told him to think of his mother and sisters, and con-
sider the trouble he would give them. Appellant then said:
"I may not kill him; but I will make him get down on his
knees and apologize." As they neared Highland appellant
requested Loschenkohl to stay behind, because Piccoli was
behind some of the trees on the roadside, and might shoot, and
he did not want anybody to get hurt for him. Then
he began to hurry up, and out-traveled his companion,
and came to Mrs. Roach's cabin about two hundred feet
ahead of him. Mrs. Roach testified that appellant looked
strange; that she did not recognize him when she first
saw him running up; that she said to him there was
something the matter; that, after a few inquiries about the
whereabouts of the saloon-keeper, (Jimmy Hamiltons,) he turned

around and said, "Defend yourself;" then she heard the report of the pistol. It appears that Piccoli was standing near his cabin door when the first shot was fired; that he ran into his cabin, and closed the door; that appellant than ran up to the window of the cabin and fired one shot through the window; that he then went into the cabin and fired three shots when Piccoli was in a stooping or fallen position on the floor; that appellant then went out of the cabin, and in a few minutes came back, "put his pistol behind Piccoli's head," and fired another shot; that Piccoli did not speak a word after the shot was fired through the window. The homicide occurred about half-past five o'clock—just about daylight. Appellant, after the homicide, talked freely about it to every one he met. One witness said: "He acted as though he ought to receive a reward, and as though everybody ought to be proud of him." To several persons he said "he had only killed a rattlesnake." To many his actions seemed strange and peculiar. Shortly after the shooting he started to return to Bullion alone; but two persons caught up with him, and accompanied him; and delivered him to the justice at Bullion. On this return trip he repeated the whole story of the quarrel and final shooting. Among other things he said "he was not sorry for himself, but was for his relations and friends;" that "he had killed him and that he was neither drunk or crazy when he did it." The next day when the sheriff took him into custody, he again voluntarily made substantially the same statements, repeating that he had not done anything that he was sorry for; that he had a mother and sisters, and felt sorry for the trouble it would cause them, but was not sorry for killing the man; that "no man could call him a bastard and he and that man live." The latter remark was made to many other persons. One witness testified that "he said if there was a jury in the world to hang him for what he had done he was willing to hang." Appellant at the time of the homicide was twenty-eight years of age.

On the part of the defense several witnesses, who had known appellant for many years, testified that at times they considered him mentally unsound. The following reasons, among others, were given why they considered him insane, viz.: That in laying a track in the mine and curving the iron rail he would insist on the curve going in the opposite direction from which it should, and then, after trying it, he would see that he was

wrong, and then roll up his eyes and laugh; that he insisted that it was unnecessary to timber any mine; that at times he was moody without cause, and would state things as true having no foundation in reason; that he had two or three times tried to commit suicide; that twice, when he was engaged as a laborer in the mines at Eureka on the day shift, he reported himself for work in the evening, just as though he had had his night's sleep, with his dinner bucket with him; that at such times he seemed to wander around as if he did not know what he was doing, but when he was spoken to about it he would go right off; that he was subject to spells of melancholy; that when moody and sullen he desired to be by himself; that he was at times eccentric and unreasonable in his conversations and actions; that at such times he talked at random, incoherently and unnaturally. Independent of these occasional peculiarities, he was considered a bright young man of average ability and intelligence, and possessed a good deal of delicacy and refinement. It was also shown that he had been the unfortunate victim of a series of accidents from early childhood to years of manhood; that the effect of the injuries he had thus received was such that when he was sick or unduly excited he would have delirium; his head would ache, and that these attacks continued and increased as he grew older. Appellant was a witness in his own behalf, and his testimony tended to show that at the time of the homicide he was laboring under the delusion that some of the persons employed at the Tripoli mine had entered into a conspiracy to take his life, and that they had hired Piccoli to kill him, and that he was compelled to kill Piccoli, and did kill him, in order to save his own life, in necessary self-defense.

The witnesses in rebuttal on the part of the state testified that he was a competent and faithful workman; that his acts, conduct, and conversations at the various times they had known him were rational and natural; that on the evening before and morning of the homicide he was excited and nervous; that in their opinion he was sane, and knew right from wrong. Upon this statement of facts, as shown by the record on appeal, we shall proceed to notice in detail the various assignments of error relied upon by appellant for a reversal of the judgment.

1. The objections urged against the rulings of the court in excluding portions of the testimony of Mrs. Bates, J. Hender-

son, and P. Webber, witnesses for appellant, will be considered together. Mrs. Bates, the mother of appellant, had testified at length and with great minuteness of detail in regard to the numerous accidents and spells of sickness that had befallen her son, and the effects thereof upon his mind, from the time of his birth in 1858 up to 1875, when he left home, and started out into the world to make a living for himself. She then, in answer to questions, stated that after the homicide she came to Elko, went into the jail, and said: "'My son, my son, what is this?' and he was walking up and down, and he said, 'It is a terrible thing to be confined in this manner;' and he said, 'I want you to do me a favor,' and I said, 'What is that? I came to see you, and help you out of this trouble.'" Here counsel for the state objected to the conversation in the jail, on the ground "that it might be manufactured testimony," and "that it is hearsay." This objection was sustained by the court. Appellant's counsel excepted to the ruling, and stated that the conversation was "offered to show the mental condition of the defendant at the time of the interview, and as tending to show that he was insane at the time of the conversation with the witness." J. Henderson testified that appellant had been in his employ about two months; that he had seen him in Bullion after the difficulty, and saw him in jail at Elko a day or two afterwards; that he had a conversation with him there about the employment of someone to represent him in the case. At this point similar objections, rulings, and statements were made. The witness Webber was a brother-in-law of appellant, and had given testimony concerning certain peculiarities of appellant towards his mother and sisters, when counsel asked the following questions: "What has been the feeling of the defendant in respect to the children, so far as exhibited by him by his actions? Have you noticed the defendant's actions, his manner, his conduct, and his expressions in relation to his sisters and to your children heretofore? Has there been a change in the defendant's deportment, and his manner in relation to and towards his sisters, his mother, and his nieces—your children—to your knowledge?" Each question was objected to on the ground "that it is immaterial and irrelevant, and that it may be manufactured testimony." The objections were sustained. No statement was made by appellant's counsel as to the purpose of these questions.

These various rulings of the court are presented in a very unsatisfactory manner. We are left to grope our way in darkness. No question was asked, answer given, or statement made, that enables us to determine what the nature of either conversation was, or what particular bearing, if any, the answer to either question would have had upon the issue of appellant's sanity or insanity. It is not claimed that the conversations or questions were offered for the purpose of enabling the witnesses, or either of them, to state any facts upon which to lay the foundation for a question as to their opinion as to appellant's sanity or insanity. No such questions were asked of either of these witnesses. The most that can be said is that it is within the realm of imagination that the conversation and answers to the questions might have been relevant. In the absence of any knowledge, or of any facts upon which knowledge could be based, as to what the matter was, and the failure to affirmatively show the materiality and relevancy of the conversations and questions, we do not feel justified in reversing the case upon the ground that it is possible to imagine error in these rulings. It is as easy to imagine that the court did not err as to presume that it did. If presumptions are to be indulged in, then the rule of law is that it is our duty to presume in favor of, rather than against, the action of the district court. It is the duty of appellant, in a criminal as well as in a civil case, affirmatively to show error. In order, therefore, to show that the excluded evidence was important, and that the court erred in its ruling, counsel should have stated just what they expected to show, and then, if the court ruled it out, should have embodied the facts in a bill of exceptions, so as to fairly and clearly present the point; otherwise this court cannot say that the rejection of the conversations or answers to the questions was prejudicial to appellant.

Counsel claim that the court sustained the objections to the testimony of the witnesses Bates and Henderson upon the sole ground that the conversations occurred subsequent to the homicide. If so, then this fact ought to have been affirmatively shown. " Upon the question of sanity at the time of committing an offense, the acts, conduct and habits of the prisoner at a subsequent time may be competent as evidence in his favor. But they are not admissible as of course. When admissible at all it is upon the ground, either that they are so connected

with or correspond to evidence of disordered or weakened mental condition preceding the time of the offense as to strengthen the inference of continuance, and carry it by the time to which the inquiry relates, and thus establish its existence at that time; or else that they are of such a character as of themselves to indicate unsoundness to such a degree or of so permanent a nature as to have required a longer period than the interval for its production or development." (*Commonwealth* v. *Pomeroy*, 117 Mass. 148.) If the acts, conduct and habits of the defendant after the homicide are to be thus restricted, is not the same reasoning as sound, or of greater strength, in favor of a limitation upon the admission of his subsequent conversations? They should not be admitted as a matter of course. It is doubtful testimony at best, and, if ruled out, the error, if any, must affirmatively appear. It will not be denied that a mere narration or statement of a defendant, after the commission of a crime, having no connection with the issue, is inadmissible. In *State* v. *Hays*, 22 La. Ann. 40, (the leading case relied upon by appellant,) this principle is expressly recognized. The difference between that case and this is, that there it was affirmatively shown by the record that the court ruled out the subsequent conversations on the express ground that they were not admissible because made subsequent to the homicide, and were not a part of the *res gestæ*, while in this case there is no such showing. What the court said in *State* v. *Hays* was with a view of furnishing a guide for the *nisi prius* courts in the trial of such cases, and is an authority to the effect that subsequent conversations tending in their nature to show the condition of defendant's mind are admissible in evidence. There is nothing said in the opinion that militates against the views we have expressed, and, on the other hand there is, as before stated, a clear recognition of the principle we have announced concerning the admission of such testimony. To justify a reversal upon the ground of the exclusion of the testimony referred to, it ought to have in some manner been made to appear that the conversations had some special significance indicating either mental disease, or tending in some degree to show an unsound mind or insanity upon the part of appellant.

2. J. A. Plummer, one of the attorneys employed by appellant, was a witness in his client's behalf, and testified that he

visited him in the jail almost daily from the time of his arrest up to the first trial of the case, and noticed his manner, expression, and tone of voice, with a view to discover his mental condition, and "to make a study of him." It is claimed that the court erred in refusing to allow this witness to answer the following questions: "(1) From the consultations you had with him, did he impress you in a natural way or otherwise? (2) During your conversation with him, was his appearance and manner, actions and conversation, natural or unnatural, rational or irrational? (3) During any conversation with him that you may have had at any time, has he ever manifested any remorse or regret for having killed Piccoli? (4) Did you ever notice, in your talk with him, any incoherence in his remarks, or foolish and silly talk?" Although these questions were ruled out as improper, yet the witness was permitted, by another line of questions, to substantially answer all of them except the third. We quote from the record. " Question. What was the condition of his nerves and organism, as manifested by his actions and appearances? Answer. I should say that he was decidedly nervous. He seemed to be so nervous that there was a constant jerking of his nerves. Q. Can you illustrate? A. I can illustrate his actions better by doing as he did than by words. I can explain it by saying he was unstrung, nervous, excitable, in constant motion. Q. Was it about the trunk or head? A. It was principally about the head and shoulders, and he kept moving his limbs around, and stepped one way and then another; but I noticed the motion was more irritated around his head and shoulders." This explanation of appellant's conduct, acts, and manner enabled the jury to understand the condition of his mind as well as if the witness had answered the questions *seriatim,* and given his opinion as to appellant's sanity or insanity. If, therefore, any error occurred, it was cured by the answers which the witness was allowed to give. With reference to the third question, it is equally apparent that there was no error in ruling it out that was prejudicial to appellant. All the testimony, without contradiction, tended to show that he never manifested any remorse, or expressed any regret, save the trouble it would give others, at having killed Piccoli. It is therefore fair to presume that the testimony of this witness, if admissible, would have been simply to the same effect. If it were otherwise, *its* tendency

might have been prejudicial, as tending to show that his reasoning powers were not destroyed, and that he was conscious of the responsibility of his act.

3. The only testimony tending to support the plea of insanity was that of non-expert witnesses who were acquainted with appellant. No objection was made to this character of testimony when introduced by the defense; but when the prosecution, in rebuttal, introduced similar testimony to establish the sanity of appellant, objections were made to the following questions asked of several witnesses, who testified as to their knowledge of appellant, viz..: "(1) From his appearance, actions, condition, and conversation at such times as you noticed him, was he sane or insane? (2) In your opinion, did he know the difference between right and wrong at that time?" The grounds of the objections were that no foundation had been laid for the questions; that it was not shown that the witness was competent to answer them; and that the testimony was irrelevant, incompetent and immaterial. These objections were overruled, and the witnesses gave their opinions that appellant was sane, and that he knew the difference between right and wrong. We shall treat the second question as a simple repetition of the first one. If the right and wrong test is a proper one—which we shall have occasion to discuss when we consider the instructions—then the question was proper, as the answer thereto would tend to show whether appellant was sane or insane. (*Clark* v. *State*; 12 Ohio, 483; 40 Am. Dec. 481; *Powell* v. *State*, 25 Ala. 29.) We do not understand appellant's counsel to claim that the opinions of witnesses, not experts, as to the sanity or insanity of a defendant accused of crime, are not admissible in evidence, although they have cited several cases that adhere to that doctrine. Their contention is that "the incidents and circumstances, the actions, the assertions, the conversations, and the declarations producing the impression upon the witness' mind are first to be laid before the jury, and then the witness may be allowed to state the impressions created thereby, and dependent thereon." Can this position be maintained? As a general rule it is undoubtedly true that it is the facts which a witness gives of the conduct, acts, manner, and conversation of the defendant which constitutes the greatest value of his testimony, and that the testimony of a witness

having but a limited knowledge upon these matters ordinarily has but little, if any weight with the jury; but it is not true that a witness is bound to give, or that he can in all cases give, the glare of the eye, the wild look, the peculiar expressions, or strange demeanor of the defendant. There are many cases. where the mental condition of a person depends as much, or more, upon his looks and gestures, connected with his acts, conduct, or conversation, as upon the words and actions themselves; and it would often be difficult, and sometimes impossible, for the witness to intelligently give all the details upon which his opinion is based. The law does not require it.

There was no strict rule applied as to the general knowledge of the witnesses introduced by the defense. Great latitude was allowed upon both sides. Some of the facts stated by the witnesses for the defense, and upon which their opinions were based, did not even tend to establish insanity in the remotest degree; and the reasons given by some for their opinions were very weak, and in a few instances so unreasonable and absurd as to be unworthy of mention. On the other hand, some of the witnesses who testified on the part of the state had such a brief acquaintance with and limited knowledge of the appellant as to deprive their testimony of any special weight or value. The witness Hume, against the admission of whose opinion the argument of counsel is principally based, testified that he had only known defendant for about four months prior to the homicide; that he saw him every day during the summer; that he generally met him as he went to breakfast; that he sat at the same table, and ate with him once or twice; that he noticed him around the house; that he observed his manner of speech and conversation; that he saw him in the evening and night before the homicide; that on the morning after the homicide he went to Bullion with him, and had considerable conversation on the way. The real question to be determined by the jury was as to appellant's sanity or insanity at the time of the homicide. The testimony as to the condition of his mind at times previous and subsequent thereto is admissible solely upon the ground that it tends to show the mental condition at the time of the homicide. The acquaintance of this witness with appellant, although slight, embraced a very important period of time. He saw him just before and immediately after the commission of the act. His knowledge seems to have been

sufficient to enable him to form and express an opinion, and we cannot say that he did not have sufficient opportunities to arrive at a correct conclusion in regard to the condition of appellant's mind. When the' opinions of such witnesses, from the necessities of the case, are received as evidence, the weight of their testimony does not depend so much upon the number as upon the intelligence of the witnesses, and their capacity to form correct opinions, their means of information, the unprejudiced state of their minds, and the nature of the facts and circumstances testified to in support of their opinions. It would, perhaps, be difficult to lay down any general rule establishing precisely the requisite knowledge which a witness must possess in order to justify or warrant the expression of an opinion. It may, however, be safely said that if the witness has had sufficient observation to enable him to form a belief upon the question he is a competent witness. The admissibility of this character of testimony must necessarily be left, to a great extent, to the discretion of the presiding judge; and when the testimony is admitted, unless it clearly appears that there has been an abuse of that discretion, the appellate court ought not to interfere. In *Baldwin* v. *State*, 12 Mo. 223; the court said: " Before a witness should be received to testify as to the condition of mind, it should appear that he had an adequate opportunity of observing and judging of capacity. But so different are the powers and habits of observation in different persons that no general rule can be laid down as to what shall be deemed a sufficient opportunity of observation, other than that it has in fact enabled the observer to form a belief or judgment thereupon; and the weight of his opinion must depend upon a consideration of all the circumstances under which it was formed." In *Brown* v. *Commonw.*, 14 Bush, 905, the court in discussing this question, said: " Exactly what is meant by the expression in some cases, when such evidence has been admitted, that ' the witnesses must detail the facts upon which the opinion is based,' we do not find explained. If the admissibility of the opinion as evidence must depend upon the facts from which it is formed, it is manifest that there is a question for the court antecedent to its introduction, and that to promulgate a general rule as to the amount and quality of the evidence that should satisfy the court in every case would be impossible. The court must be satisfied that the witness has had an opportunity, by

association and observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but as to the extent and character of the evidence, no better rule can be established than to leave it within the discretion of the court. * * * It must vary with the circumstances of each case, and by these circumstances the jury must determine for themselves the weight to which the opinion may be entitled. 'It is not intended that the admissibility of the evidence shall be made to depend upon the ability of the witness to state specific facts, from which the jury may, independent of the opinion of the witness, draw a conclusion of sanity or insanity; for it is the competency of the opinion of the witness that is the subject of inquiry. The ability of the witness to detail certain facts which are in themselves substantive evidence of the condition of the mind, may add very greatly to the weight of the opinion given in evidence, but they will not of necessity affect the question of competency." (See also, *Colee* v. *State,* 75 Ind. 513; *Goodwin* v. *State,* 96 Ind. 558; *Choice* v. *State,* 31 Ga. 467; *Powell* v. *State,* 25 Ala. 29; *Ford* v. *State,* 71 Ala. 397; *People* v. *Pico,* 62 Cal. 53; *People* v. *Levy,* 71 Cal. 623; *People* v. *Fine,* 77 Cal. 147.) In the light of the facts of this case, and of the authorities upon this subject, we are of the opinion that the court did not err in allowing the witnesses for the state to answer the questions and give their opinions as to appellant's sanity or insanity at the times they knew him.

4. The instructions refused and given are of unusual length, covering over one hundred pages of the transcript. The objections urged by counsel do not, however, relate as much to the form and phraseology as to the general rules given as safe and proper guides to the jury. It is claimed that the court erred—*first,* in instructing the jury that the "right and wrong test" was the proper one upon which the question of the defendant's sanity or insanity should be determined; *second,* in instructing the jury that the burden of proof rested upon the defendant to establish the plea of insanity by a preponderance of evidence to the satisfaction of the jury; *third,* upon the question of insane delusions. It is proper to state in advance that there has ever been a great diversity — an irreconcilable conflict — of opinion upon each of these points. In order to properly and intelligently determine these questions, raised for the first time in

this court, we have taken the time, pains and patience to read and carefully examine all of the great number of cases to be found in the courts of last resort in the several states. In all that we may have to say in regard to the disputed and debatable questions it must be distinctly understood that our object is to determine whether or not the general tests and rules, as laid down in the instructions given by the court, are proper, as applied to the particular facts of this case. In arriving at this determination we shall endeavor to keep constantly in view the vital and important truths that the advancements made in medical science, the progress of a better and more extended knowledge of the subject of insanity, and a clearer sense of legal duty and of christian obligations, have relaxed to a great extent the harsh, unjust, and cruel rules of the early cases in England, where it was held that for a man to be insane he must have no more reason than a brute, an infant, or a wild beast; that the law in its humane and benevolent treatment of the unfortunate insane has kept pace with the enlightened progress of the age; that the plea of insanity is not, and should not, when fairly presented and honestly relied upon, be looked upon with disfavor; that it is entitled to as much consideration as any other plea that is founded in justice, reason, humanity and common sense, and that juries can be as safely trusted with a fair investigation of the questions relating to this plea as of any other controverted questions of fact. As there are several different kinds of insanity, and different degrees of each particular kind, and the features thereof assume so many different forms, it will readily be seen that no general rule, absolutely universal in its application and unchangeable in its phraseology, can be laid down as a proper guide for juries to follow in every conceivable case where the question of insanity is raised. Cases may arise, exceptional in their character, where the rules ordinarily applied as tests of insanity would have to be varied so as to meet the peculiar facts of the particular case. But because such cases may occur, or have existed, it does not by any means or method of sound reasoning follow that no general rule can be given that will be applicable to a great majority of cases. With these general observations, pertinent to each of the points stated, we shall now proceed to consider them separately in the order we have designated, although they are, of course, more or less blended together in the instructions as given by

the court, and are frequently united in the discussions in many of the authorities.

5. At the request of the prosecution the court instructed the jury as follows: "(1) To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong. The true test of insanity is whether the accused at the time of committing the crime was conscious that he was doing what he ought not to do; and if he was conscious that he was doing wrong, and acted through malice or motives of revenge, he cannot avail himself of the defense of insanity. (2) The true test of criminal responsibility, where the defense of insanity is interposed—the test binding upon the jury—is: Was the accused, at the time of doing the act complained of, if you find that he did it, conscious of the act he was doing? Did he know at the time that it was wrong for him to do it? Had he at the time the power of distinguishing good from evil, right from wrong, as to the act he was doing? Had he the mental capacity to appreciate the nature and quality of the act he was doing, or to know that it was a violation of the rights of another? If another person had committed the act, would he have appreciated the wickedness of it? If he had the capacity thus to appreciate the character and to comprehend the probable consequences of his act, he is responsible to the law for such act. If he did not have such capacity, and did not thus appreciate the nature and quality of the act he was doing, he is not responsible to the law for such act, and is not guilty of any crime." The court, of its own motion, instructed the jury that (1) "the true test of criminal responsibility, where the defense of insanity is interposed, is whether the accused had, at the time he killed deceased, sufficient use of his reason to understand the nature of the act he was committing, and to understand that it was wrong and contrary to law for him to commit it. If this was the fact, he is criminally responsible for it, whatever peculiarities may be shown about him in other respects; whereas, if his reason was so defective in consequence of mental disorder, generally supposed to be caused by brain disease, that he could not understand what he was doing, or that what he was doing was wrong, he

should be treated as an irresponsible person. In other words, did he at the time know that he was killing a man and that such killing was wrong and contrary to law? If so he was responsible for his acts, no matter what peculiarities or eccentricities or disorders of the mind may have existed upon other subjects or at other times." (2) In referring to the right and wrong test in connection with the question of insane delusions, the court instructed the jury as follows: "It may aid you in coming to a conclusion as to the defendant's condition of mind at the time of the killing, to determine what was his ordinary or usual condition of mind. Was his permanent, ordinary and usual condition such, in consequence of disease, that he was unable to understand the nature of his actions, or to distinguish between right and wrong in his conduct? Was he subject to insane delusions that destroyed his power to so distinguish, and did this continue down to and embrace the act for which he is tried? If so, he was simply an irresponsible lunatic; or, on the other hand, had he the ordinary intelligence of sane people, so that he could distinguish between right and wrong as to his own actions and the actions of others? If you are satisfied that his chronic or usual condition was that of sanity, at least so far that he knew the character of his own actions, and whether they were right or wrong, and was not under any permanent insane delusions, which destroyed his power of discriminating between right and wrong as to them, then the only inquiry remaining is whether there was any special insanity connected with this killing.

We are of the opinion that these instructions, as applied to the facts of this case, are unobjectionable. They correctly declare the general principles of law as announced in the great weight of authorities upon the subject. The general test that, if a man has capacity and reason sufficient to enable him to distinguish right from wrong as to the particular act in question, and has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, he is, in the eye of the law, of sound mind and memory, and should be held criminally responsible for his acts, is approved in a majority of the cases. The qualifications stated in the instructions: "Had he at the time the power of distinguishing good from evil?" and "was he subject to insane delusions that destroyed his power to so distinguish?" and other explanations and qualifications stated

therein, render it unnecessary to discuss some of the distinctions to the general test, as applied in some of the authorities. It is enough to say that the instructions, taken in their entirety, are correct, and that the general principles announced therein are sustained in the following states and authorities, viz.: Arkansas, in *Williams* v. *State*, 50 Ark. 511; California, in *People* v. *McDonell*, 47 Cal. 134; Delaware, in *State* v. *Danby*, 1 Houst. Crim. Cas. 166; *State* v. *West*, Id. 371; *State* v. *Dillahunt*, 3 Har. (Del.) 553; Georgia, in *Roberts* v. *State*, 3 Ga. 310; *Choice* v. *State*, 31 Ga. 425; *Anderson* v. *State*, 42 Ga. 32; *Humphreys* v. *State*, 45 Ga. 190; *Brinkley* v. *State*, 58 Ga. 296; Kansas, in *State* v. *Mowry*, 37 Kan. 369; Maine, in *State* v. *Lawrence*, 57 Me. 574; Maryland, in *Spencer* v. *State*, 69 Md. 37; Massachusetts, in *Commonw.* v. *Rogers*, 7 Metc. 500; 41 Am. Dec. 458; Minnesota, in *State* v. *Shippey*, 10 Minn. 223; 88 Am. Dec. 70; Mississippi, in *Bovard* v. *State*, 30 Miss. 600; *Cunningham* v. *State*, 56 Miss. 269; 21 Am. Rep. 360; Missouri, in *State* v . *Huting*, 21 Mo. 464; *State* v. *Redemeier*, 71 Mo. 147; 36 Am. Rep. 462; *State* v. *Erb*, 74 Mo. 199; *State* v. *Kotovsky*, Id. 247; *State* v. *Pagels*, 92 Mo. 300; Nebraska, in *Wright* v. *People*, 4 Neb. 407; New Jersey, in *State* v. *Spencer*, 21 N. J. Law, 197; New York, in *Freeman* v. *People*, 4 Denio, 28; 47 Am. Dec. 216; *Willis* v. *People*, 32 N. Y. 715; *Flanagan* v. *People*, 52 N. Y. 467; 11 Am. Rep. 731; *Moett* v. *People*, 85 N. Y. 374; North Carolina, in *State* v. *Brandon*, 8 Jones, (N. C.) 463; *State* v. *Haywood*, 62 N. C. 376; Ohio, in *Farrer* v. *State*, 2 Ohio St. 70; *Loeffner* v. *State*, 10 Ohio St. 599; *Blackburn* v. *State*, 23 Ohio St. 146; Pennsylvania, in *Commonw.* v. *Freeth*, 5 Clark, 455; *Commonw.* v. *Mosler*, 4 Pa. St. 266; *Brown* v. *Commonw.*, 78 Pa. St. 123; South Carolina, in *State* v. *Bundy*, 24 S. C. 445; 58 Am. Rep. 263; Tennessee, in *Stuart* v. *State*, 1 Baxt. 179; Texas, in *Thomas* v. *State*, 40 Tex. 63; *Clark* v. *State*, 8 Tex. App. 359; *Leache* v. *State*, 22 Tex. App. 279; 58 Am. Rep. 638; Virginia, in *Dejernette* v. *Commonw.*, 75 Va. 878. In the district and circuit courts of the United States, viz.: *United States* v. *Holmes*, 1 Cliff. 117; *United States* v. *McGlue*, 1 Curt. 8; *United States* v. *Shults*, 6 McLean, 121; *Guiteau's Case*, 10 Fed. Rep. 168; *United States* v. *Young*, 25 Fed. Rep. 710; *United States* v. *Ridgeway*, 31 Fed. Rep. 144; *United States* v. *Faulkner*, 35 Fed. Rep. 730; *Territory* v. *Catton*, Utah, Feb. 1888; 16 Pac. Rep. 902. The following authorities either deny the correctness of the general test, or claim that modifications thereof should be made, viz.: Indiana, *Stevens* v. *State*, 31 Ind. 485; 99 Am. Dec. 634; *Bradley* v-

*State*, Id. 492; but see *Walker* v. *State*, 102 Ind. 511; New Hampshire, *State* v. *Pike*, 49 N. H. 399; 6 Am. Rep. 533; *State* v. *Jones*, 50 N. H. 369; 9 Am. Rep. 242; Illinois, *Hopps* v. *People*, 31 Ill. 390; 83 Am. Dec. 231; *Dunn* v. *People*, 109 Ill. 636.

6.  Upon whom is the burden of proof? The court, at the request of the prosecution, instructed the jury that the defendant "is presumed to be sane until the contrary is shown, and a doubt upon this question alone should not acquit, for insanity is an affirmative proposition, and the burden of proving it is upon the defense." "With regard to the methods of proof by which the defense of insanity may be established, the law, from considerations of public policy, the welfare of society, and the safety of human life, proceeds with great caution, and has adopted a certain standard by which the insanity of the party on trial may be proved when relied upon. The burden of proving insanity rests upon the defendant, and, to warrant you in acquitting him solely upon that ground, his insanity at the time of committing the homicide—if you find that he did commit it—must be established by a preponderance of proof. The evidence of insanity must outweigh and overcome the presumption of, and evidence in favor of, sanity in some appreciable degree, and render it more probable that he was insane than that he was sane. Insanity, being a fact to be proved by the defendant, must be established by evidence in the case with the same clearness and certainty as any other fact alleged by the defendant in his defense; that is to say, the proof must be such in amount that, if the single issue of the sanity or insanity of the defendant should be submitted to the jury in a civil case, they would find that he was insane. Insanity is not proved or established by simply raising a doubt as to whether it exists or not." The court, of its own motion, instructed the jury that "the defendant is presumed to be sane until proven insane. In determining whether the defense of insanity has been made out, you must decide whether the evidence for or against it outweighs. If the evidence tending to show insanity outweighs that against it, then it is proven; if the proof against it outweighs, then it is not proven. If not proven, it is out of the case; if proven, it takes its place along with other received proof; and if, upon the whole evidence, as thus settled, there is any reasonable doubt of guilt, either in existence or degree, the

defendant must be given the benefit of such doubt, either to acquit or reduce the grade of the crime."

In regard to the burden of proof in cases of this kind there are three separate, distinct, and well-defined theories: (1) The defendant must prove his insanity beyond a reasonable doubt. (2) The presumption of sanity prevails until it is overcome by a preponderance of evidence showing the defendant's insanity to the satisfaction of the jury. (3) If any 'evidence is introduced tending to prove that defendant is insane, the state is bound to prove and establish his sanity, like all other elements of the crime, beyond a reasonable doubt. The first theory is sustained in Delaware, *State* v. *Pratt,* 1 Houst. 268; and in New Jersey, *State* v. *Spencer,* 21 N. J. Law, 197; but see *Graves* v. *State,* 45 N. J. Law, 359; 46 Am. Rep. 778. The second and third are each supported by a formidable array of respectable authorities, and have been respectively discussed with great learning and ability by the most eminent jurists in the United States and in England. The second —the one adopted in this case—is sustained in the following states, and authorities therein, viz.: Alabama, in *Boswell* v. *State,* 63 Ala. 308; 35 Am. Rep. 20; *Ford* v. *State,* 71 Ala. 385; *Parsons* v. *State,* 81 Ala. 597; 60 Am. Rep. 193; *Gunther* v. *State,* 83 Ala. 96; Arkansas, in *McKenzie* v. *State,* 26 Ark. 335; *Casat* v. *State,* 40 Ark. 523; *Coates* v. *State,* 50 Ark. 330; *Williams* v. *State,* 50 Ark. 511; California, in *People* v. *Myers,* 20 Cal. 518; *People* v. *Coffman,* 24 Cal. 230; *People* v. *McDonell,* 47 Cal. 134; *People* v. *Wilson,* 49 Cal. 14; *People* v. *Bell,* Id. 448; Connecticut, in *State* v. *Hoyt,* 46 Conn. 337; Georgia, in *Choice* v. *State,* 31 Ga. 473; *Humphreys* v. *State,* 45 Ga. 190; *Fogarty* v. *State,* 80 Ga. 450; Idaho Territory, in *People* v. *Walter,* 1 Idaho, 391; Iowa, in *State* v. *Felter,* 32 Iowa, 50; *State* v. *Bruce,* 48 Iowa, 530; 30 Am. Rep. 403; *State* v. *Trout,* 74 Iowa, 545; 7 Am. St. Rep. 499; Kentucky, in *Graham* v. *Commonwealth,* 16 B. Mon. 594; *Kriel* v. *Commonwealth,* 5 Bush, 372; *Brown* v. *Commonwealth,* 14 Bush, 401; *Ball* v. *Commonwealth,* 81 Ky. 662; Louisiana, in *State* v. *Burns,* 25 La. Ann. 302; *State* v. *Coleman,* 27 La. Ann. 692; Maine, in *State* v. *Lawrence,* 57 Me. 582; Massachusetts, in *Commonwealth* v. *Rogers,* 7 Metc. 504; 41 Am. Dec. 458; *Commonwealth* v. *Eddy,* 7 Gray, 583; *Commonwealth* v. *Heath,* 11 Gray, 303; Minnesota, in *Bonfanti* v. *State,* 2 Minn. 132; *State* v. *Grear,* 29 Minn. 225; Missouri, in *State* v. *Huting,* 21 Mo. 476; *State* v. *McCoy,* 34 Mo. 535; 86 Am. Dec. 121; *State* v. *Klinger,* 43 Mo. 127; *State* v. *Smith,* 53 Mo. 270; *State* v. *Rede-*

*meier*, 71 Mo. 176; 36 Am. Rep. 462; *State* v. *Erb*, 74 Mo. 204; *State* v. *Pagels*, 92 Mo. 300; North Carolina, in *State* v. *Starling*, 6 Jones (N. C.) 366; *State* v. *Willis*, 63 N. C. 26; *State* v. *Vann*, 82 N. C. 636; New Jersey, in *Graves* v. *State*, 45 N. J. Law, 359; 46 Am. Rep. 778; Ohio, in *Loeffner* v. *State*, 10 Ohio St. 616; *Bond* v. *State*, 23 Ohio St. 357; *Bergin* v. *State*, 31 Ohio St. 115; Pennsylvania, in *Ortwein* v. *Commonw.*, 76 Pa. St. 415; 18 Am. Rep. 420; *Lynch* v. *Commonw.*, 77 Pa. St. 213; *Brown* v. *Commonw.*, 78 Pa. St. 128; *Meyers* v. *Commonw.*, 83 Pa. St. 141; *Pannell* v. *Commonw.*, 86 Pa. St. 268; *Sayres* v. *Commonw.*, 88 Pa. St 291; South Carolina, in *State* v. *Paulk*, 18 S. C. 514; *State* v. *Bundy*, 24 S. C. 439; 58 Am. Rep. 263; Texas, in *Webb* v. *State*, 5 Tex. App. 607; *Clark* v. *State*, 8 Tex. App. 359; *Webb* v. *State*, 9 Tex. App. 491; *King* v. *State*, Id. 557; *Johnson* v. *State*, 10 Tex. App. 578; *Lache* v. *State*, 22 Tex. App. 279; 58 Am. Rep. 638; *Massengale* v. *State*, 24 Tex. App. 181; Virginia, in *Boswell's Case*, 20 Grat. 874; *Baccigalupo* v. *Commonw.*, 33 Grat. 817; West Virginia, in *State* v. *Strauder*, 11 W. Va. 823; 27 Am. Rep. 606; *State* v. *Robinson*, 20 W. Va. 740; 43 Am. Rep. 799.  The third theory is sustained in Illinois, in *Hopps* v. *People*, 31 Ill. 393; 83 Am. Dec. 231, overruling *Fisher* v. *People*, 23 Ill. 293; *Chase* v. *People*, 40 Ill. 358; Indiana, in *Polk* v. *State*, 19 Ind. 170; 81 Am. Dec. 382; *Stevens* v. *State*, 31 Ind. 491; 99 Am. Dec. 634; *Guetig* v. *State*, 66 Ind. 95; 32 Am. Rep. 99; *McDougal* v *State*, 88 Ind. 27; Kansas, in *State* v. *Crawford*, 11 Kan. 42; *State* v. *Mahn*, 25 Kan. 187; Michigan, in *People* v. *Garbutt*, 17 Mich. 9; 97 Am. Dec. 162; Mississippi, in *Cunningham* v. *State*, 56 Miss. 273; 21 Am. Rep. 360; Nebraska, in *Wright* v. *People*, 4 Neb. 407; New Hampshire, in *State* v. *Bartlett*, 43 N. H. 224; 80 Am. Dec. 154; *State* v. *Pike*, 49 N. H. 399; 6 Am. Rep. 533; *State* v. *Jones*, 50 N. H. 370; 9 Am. Rep. 242; New York, in *People* v. *McCann*, 16 N. Y. 58; *Brotherton* v. *People*, 75 N. Y. 159; *Moett* v. *People*, 85 N. Y. 374; 69 Am. Dec. 642; *O'Connell* v. *People*, 87 N. Y. 380; 41 Am. Rep. 379; Tennessee, in *Dove* v. *State*, 3 Heisk. 349.

It will, from this review, be seen that there is a large majority of the decided cases in the United States in favor of the theory given in the instructions in this case.  The question ought not, however, to be decided simply upon the ground of the greater number of the authorities.  In many of the cases which adhere to the third theory it is earnestly and ably contended by learned judges, whose opinions have ever been entitled to great respect

and consideration, that the burden of establishing the killing and the malicious intent is always upon the prosecution; that there cannot, logically, be any separation of the ingredients of the crime so as to require a part thereof, only, to be established by the state, and the balance to be established by the defendant; that the idea that the burden of proof ever shifts in a criminal case is unphilosophical and at war with the fundamental principles of criminal law; that the rule established by a majority of the decided cases strips the defendant of the presumption of innocence which the law has given him as a shield throughout the entire proceedings, until the verdict of the jury establishes the fact, beyond a reasonable doubt, that he not only committed the act, but that he did so with malicious intent.

We are of opinion that the weight of reason, as well as the decided preponderance of the authorities, is opposed to these views. It is undoubtedly true that it is incumbent upon the prosecution to prove every fact that is material, essential, and necessary to constitute the crime of which the defendant is accused, which, of course, includes the sanity of the defendant; but is it not equally true that the burden of proving his sanity is fully met by the presumption of law "that every person is of sound mind until the contrary appears?" If this be true, then it is not a harsh, unphilosophical, or inhuman rule that requires a defendant, who seeks to avoid the punishment which the law imposes upon him for the crime he has committed, by means of the defense of insanity, to rebut the presumption of sanity by proof that is satisfactory to the jury. Insanity being in its nature an affirmative defense, does it not necessarily follow that, where the sanity of the defendant is established by the presumption of law, or by the testimony of witnesses, or by both, the defendant in order to overcome this presumption or testimony, must establish his insanity by a preponderance of the evidence?

The presumption of the law in favor of innocence is essential, not only to the safety of the individual accused of crime, but is absolutely necessary for the protection and security of society, and it is universally recognized in the trial of all criminal cases. But there are other legal and well-recognized presumptions, sanctioned by law and approved by the wisdom of ages, which are equally as important and as indispensable to individuals and to the well-being, safety, and protection of society, and

equally as necessary for the proper administration of justice in the trial of criminal cases. Within this category prominently stands the presumption of sanity. " Every man is presumed to be sane." Is not this presumption as necessary and as universal in its application as the presumption of innocence? Ought not proof to be required to rebut the one as well as the other? When an individual has committed an offense without any excuse or justification, and attempts to shield himself from the legal consequences of his act on the ground that he was insane when he committed the deed, the law ought to demand of him such a degree of evidence in support of this defense as will, at least, satisfy the jury that when he committed the act he was not responsible for his acts because he was insane. " This rule is founded in wise policy, and is obviously necessary for the protection of society, as much so as that which requires satisfactory evidence to rebut the presumption of innocence. Besides the character of the presumption, its necessary operation in almost every transaction of life, and its almost universal application in civil as well as criminal cases, there are other cogent reasons for this requisition of clear and satisfactory evidence in support of a defense in criminal cases grounded alone upon insanity. In ordinary defenses, such as self-defense, want of malice, sudden heat and passion, and so forth, when, by reason of the killing, the burthen of proof rests upon the accused to rebut the legal presumption of malice, the facts relied on are usually a part of the transaction, or so directly connected with it, and so simple and few, that they are readily comprehended and appreciated by a jury, and no jury will convict in such cases whilst a rational doubt is entertained as to the reality and merit of the defense relied on, notwithstanding the burthen of proof may be, by legal presumptions, cast upon the accused. But the plea of insanity is peculiarly liable to abuse, it can be so easily concocted, and facts, admissible as evidence in its support, so readily manufactured by the accused. The latitude of inquiry in such cases is almost boundless. It does not, as other defenses, depend upon the proof of facts comprehensible to ordinary minds, and connected remotely or immediately with the transaction under investigation; but in its support facts having no connection with the transaction, only so far as they may tend to show general or previous insanity of the accused,

but happening long anterior to the commission of the offense
for which he was tried, and the opinions of learned and scien-
tific men upon such facts, are admissible as evidence. It not
unfrequently occurs that this plea is resorted to as a last
extremity, with a view of introducing under the latitudinous.
range of inquiry a multitude of facts and opinions not directly
relevant, but strictly admissible, to produce confusion and
doubt in the minds of jurors, and interpose thereby obstacles
to the attainment of just verdicts. The only safe rule in such
cases is to require in support of such defense satisfactory
evidence that at the time of the commission of the act the party
accused was insane. Less than that ought not to suffice, nor with
less is the law content." (*Graham* v. *Commonw., supra.*)

If we now analyze the subject we shall find that this is the
only safe conclusion for society, while it is just to the prisoner.
Soundness of mind is the natural and normal condition of men,
and is necessarily presumed, not only because the fact is gen-
erally so, but because a contrary presumption would be fatal to
the interests of society. No one can justly claim irresponsi-
bility for his act, contrary to the known nature of the race of
which he is one. He must be treated and be adjudged to be a
reasonable being until a fact so abnormal as a want of reason
positively appears. It is, therefore, not unjust to him that he
should be so conclusively presumed to be sane until the con-
trary is made to appear on his behalf. To be made so to
appear to the tribunal determining the fact, the evidence of it
must be satisfactory, and not merely doubtful, as nothing less
than satisfaction can determine a reasonable mind to believe a
fact contrary to the course of nature. It cannot, therefore, be
said to be cruel to the prisoner to hold him to the same respon-
sibility for his act as that to which all reasonable beings of his race
are held, until the fact is positively proved that he is not reason-
able. (*Ortwein* v. *Commonw., supra.*)

7. Are the instructions given upon the subject of insane
delusions erroneous? The instructions upon this point, as well
as others, are very lengthy, and cover almost every conceivable
question that could be presented. We omit all of the instruc-
tions asked by the prosecution and given by the court, and quote
such portions of the court's charge as will convey a definite idea
of the general principles embodied in all of the instructions.
upon the subject of insane delusions, as follows, viz.: " An

insane delusion is an unreasonable and incorrigible belief in the existence of facts, which are either impossible absolutely, or impossible under the circumstances of the individual. A man with no reason for it, believes that he is the owner of untold wealth, or that he has invented something which will revolutionize the world, or that he is the president or the king, or God or Christ, or that he is dead, or that he is immortal, or that he is inspired by God to do something. These delusions are as real to the demented person as anything about him can be. He knows it the same as he knows his own existence. The important thing to which I wish to call your attention is that an insane delusion is never the result of reasoning and reflection. It is not generated by them, and it cannot be dispelled by them. A man may reason himself, and be reasoned by others, into absurd opinions, and may be persuaded into impracticable schemes and foolish resolutions, but he cannot reason himself, or be reasoned or persuaded, into insanity or insane delusions. The insane delusion does not relate to mere sentiments or theories, or abstract questions in law, politics, or religion. All these are subjects of opinions which are beliefs founded upon reasoning or reflection. These opinions are often absurd in the extreme. Men believe in animal magnetism, spiritualism, and other like matters to a degree that seems unreason itself to most other people; and there is no absurdity in relation to religious, political, and social questions that has not its sincere supporters. These opinions result from naturally weak or ill-trained reasoning powers, hasty conclusions from insufficient *data,* ignorance of men and things, fraudulent imposture, and often from perverted moral sentiments; but still they are opinions founded upon some kind of evidence and reasoning, and liable to be changed by better external evidence or sounder reasoning, but they are not insane delusions."

This portion of the court's charge is copied from *Guiteau's Case,* 10 Fed. Rep. 170. It has been generally approved wherever discussed, though it is said in *Parsons* v. *State,* 81 Ala. 591; 60 Am. Rep. 193, that "the case in its facts is so peculiar as scarcely to serve the purpose of a useful precedent." These instructions were supplemented by a reference to the testimony in the case. "For instance, the defendant has testified that Piccoli had attempted to kill him by placing giant powder in a certain place in the

mine. Now, if he believed this (which is for you to determine,) and his belief was based upon something that he had seen in the mine, or had heard from others, and was the result of a consideration of the facts and of reasoning, it was not an insane delusion, and was not caused by insanity, no matter whether in your judgment there was or was not sufficient evidence to justify him in coming to this conclusion. If there was sufficient evidence to justify him in coming to this conclusion, then the reasoning was sound; if not, then it was unsound; but in either case, if the belief was the result of reasoning, it was not the product of insanity and is no evidence of insanity. There is some evidence in the case to the effect that the defendant stated that he had killed Piccoli because he had called him a bastard. Supposing this to be true, and also that the defendant really entertained the belief that he would be justified in killing any one who called him a bastard, this would not be an insane delusion, but would be a mere belief; nor, if the defendant knew that the law did not permit one to kill another under those circumstances, would the entertainment of such a belief in any manner excuse him; and, as before stated, if he knew that the law held such killing to be a crime, his belief, if he entertained it, that a jury would not convict him therefor, would constitute no excuse whatever. You have heard the defendant testify that he believed that Fred Franks had hired Piccoli to kill him; that he knew this from the fact that he had a certain conversation with Dr. Henderson, and had seen a hundred dollars in Piccoli's possession, and from other evidence, which, altogether, convinced him that such was the case. If by this system of comparison of facts and reasoning therefrom he had convinced himself that such was the case, this would not be an insane delusion, but would be a mere opinion or belief that might or might not be true." After a like comparison and conclusion with reference to the belief of defendant that it was unnecessary to timber a mine, and his wishing to bend a mining track in a wrong direction, and a further illustration of the belief of defendant that Piccoli intended to kill him, to the effect that if this belief was formed upon what he had seen and heard, and was the result of such reasoning upon facts, then it was not an insane delusion, but a belief based upon evidence, and that when men reason the law requires them to reason correctly as to their duties, the court,

upon this point, concludes its charge as follows: "Supposing
that this belief that defendant claims to have had that
the deceased intended to kill him was really an insane delusion, as
I have defined it, and was not a belief to which he had come
from considering the circumstances, then what is the law
applied to such a situation as this? It is that when a person
labors under a partial delusion only, and is not in other respects
insane—that is, is not insane upon all subjects—he must be
considered in the same situation as to responsibility as if the
facts with regard to which the delusion exists were real. But,
as I have before stated, if it was a fact that Piccoli did really
intend to kill Lewis, this would not justify Lewis in hunting
him up and killing him, when, until he had so hunted him up,
his danger, if any, was neither immediate, imminent, nor
impending; and if you find that the defendant did go to where
Piccoli was for the purpose of killing him, and that until he
had so done he was in no imminent, immediate, or impending
danger; then the fact that he had an insane delusion that
Piccoli intended to kill him constitutes no justification or
excuse."

It may be that the definitions concerning an insane delusion
were not the best that could be given. A few terse, vigorous,
and pointed instructions would doubtless have been better; but
elaboration of correct principles is not necessarily erroneous,
although there may be cases where it tends more to confuse
than to enlighten juries. The real objections urged by counsel
relate to the last portion of the instructions above quoted. Sev-
eral of the cases we have cited upon other points, as well as
cases to be found upon the point under consideration, refer to
the trial of McNaghten for the killing of Edward Drummond,
which at the time created throughout England a great degree
of interest; and resulted in having the case submitted by the
House of Lords to fifteen judges upon certain questions. Lord
Chief Justice Tindal, in referring to the one applicable to this
point, said: " The fourth question which your lordships have
proposed to us is this: 'If a person, under an insane delusion
as to existing facts, commits an offense in consequence thereof,
is he thereby excused?' To which question the answer must,
of course, depend on the nature of the delusion. But, making
the same assumption as we did before, namely, that he labors
under such partial delusion only, and is not in other respects

insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if, under the influence of his delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment. If his delusion was that the deceased had inflicted serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment." (10 Clark & F. 211.) This decision is vigorously attacked in Ray's Medical Jurisprudence of Insanity, Sec. 34 *et seq.*, where the author says that "such a remarkable doctrine as this can have sprung from only the most deplorable ignorance of the mental operations of the insane." On the other hand, in Wharton & Stille's Medical Jurisprudence, Sec. 126, it is said: "So far as the law thus stated goes, (and it is stated with extreme caution,) it has been always recognized as binding in this country." In Browne's Medical Jurisprudence of Insanity the author approves the decision in McNaghten's case, and, in the course of the discussion says: "The rule that the nature of the delusion is always to be considered in relation to the nature of the act; that when the facts which are falsely believed are such as would, if they had really existed, have justified the act, the act shall be justified, and when they are such as, even supposing they were true, would not have justified the act of which the prisoner is accused, then his act is criminal—seems to us to be open to none of the objections which are urged against it." Ludlow, J., in charging the jury in *Commonw.* v. *Freeth, supra,* said; "If this spirit of delusion existed, the act charged against the prisoner must be the direct result of this delusion, and the delusion must have been directly connected with the act driving him to its commission, and must have been such a delusion, which, if it had been a reality, instead of an imagination, would have justified him in taking life." (See, also, *Baldwin* v. *State,* 12 Mo. 231; *Boswell* v. *State,* 63 Ala. 320: 35 Am. Rep. 20; *Cunningham* v. *State,* 56 Miss. 277; 21 Am. Rep. 360; *State* v. *Mewherter,* 46 Iowa, 100 *Commonw.* v. *Rogers,* 7 Metc. 503; 41 Am. Dec 458.) Dr. Wharton says that the charge of Judge Cox in *Guiteau's Case,* has "gone a great way to finally establish the rule that delusions, to constitute a defense, must be objective as distinguished from subjective. They must be delusions of the senses,

or such as relate to facts or objects, not merely wrong notions or impressions; and the aberration in such case must be mental, not moral, and must affect the intellect of the individual. It is not enough that they show a diseased or depraved state of mind, or an aberration of the moral feelings, the sense of right and wrong continuing to exist, although it may be in a perverted condition. To enable them to be set up as a defense to an indictment for a crime they must go to such crime objectively, *i. e.*, they must involve the object at which the crime is directed;" and the editor expressed the hope that the charge " will exercise a salutary influence in the administration of justice in the future in cases of premeditated homicide, and that the long conflict of medical science, speculative at most, with its fine distinctions of mental and moral aberration, transmissions by descent, physical convulsions of the brain, etc., against legal science, based as it is on common sense and reason, upon the subject of human responsibility, will speedily approach an end, and criminals be subject to a reasonable legal test of responsibility for crime." It is, perhaps, expecting too much of men skilled in the science of medicine, and learned in the jurisprudence of the law, that they will unanimously agree upon the tests necessary to establish insanity, or that they will unite upon any definite rule as to the degree of responsibility of men who may be partially insane, or as to the burden of proof in such cases; yet it does really seem that, with all the lights of reason and authority now to be found upon the subject, there ought not to be any longer so much doubt and confusion. It is gratifying, at least, to know that there is a disposition upon the part of many of the ablest writers upon this subject, medical and legal, to make an earnest effort to harmonize many of the conflicting views which now exist.

The principles we have announced, and the rules we have followed, are believed to be legal, just, and reasonable to the defendant, proper for the fair and impartial administration of justice, safe for the interests of society, and necessary for the protection and welfare of the community at large. The judgment of the district court is affirmed.